381 A.2d 1285

**COMMONWEALTH of Pennsylvania**

v.

**Gregory WILLIAMS, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 8, 1976.
Decided Dec. 2, 1977.

436

Calvin S. Drayer, Jr., Assistant Public Defender, Norristown, for appellant.

William T. Nicholas, District Attorney, Norristown, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

HOFFMAN, Judge:

Appellant contends that the Commonwealth failed to produce sufficient evidence to convict him of attempted murder,[1] felonious restraint,[2] kidnapping,[3] aggravated assault,[4]

---

1. The Crimes Code, Act of Dec. 6, 1972, P.L. 1482, No. 334; 18 Pa.C.S. §§ 901, 2501.

2. The Crimes Code, supra; 18 Pa.C.S. § 2902.

3. The Crimes Code, supra; 18 Pa.C.S. § 2901.

4. The Crimes Code, supra; 18 Pa.C.S. § 2702.

robbery,[5] recklessly endangering another person,[6] theft of movable property,[7] possession of an instrument of crime,[8] use of a prohibited offensive weapon,[9] and criminal conspiracy.[10] Appellant also contends that the lower court erred in admitting certain unfairly prejudicial physical evidence and in allowing a Commonwealth witness to testify that appellant elected to remain silent after his arrest. We believe that the Commonwealth produced sufficient evidence to convict appellant on the above charges. However, we grant appellant a new trial because the lower court permitted a Commonwealth witness to testify that appellant elected to remain silent after his arrest.[11]

From October 28–31, 1975, appellant was tried before a jury in the Montgomery County Court of Common Pleas on the aforementioned charges. The Commonwealth adduced the following facts at trial. Mr. Rigney, a 78 year old man, testified that on May 15, 1975, he drove his 1974 Plymouth Duster into a parking lot at 69th and Walnut Streets in Upper Darby, Delaware County. After parking his car, Mr. Rigney began to read his newspaper. Suddenly, a gun protruded through the window on his left, and another gun appeared through the front passenger window on his right. Two men jumped into the car from both sides, thus sandwiching the victim in between. The two men instructed the victim to remain motionless and to look straight ahead. One of the men said: "You white MF, you're going to die, man." After driving for about 30–45 minutes, they arrived at an isolated spot in the Strawberry Mansion section of Fair-

5. The Crimes Code, supra; 18 Pa.C.S. § 3701.

6. The Crimes Code, supra; 18 Pa.C.S. § 2705.

7. The Crimes Code, supra; 18 Pa.C.S. § 3921.

8. The Crimes Code, supra; 18 Pa.C.S. § 907.

9. The Crimes Code, supra; 18 Pa.C.S. § 908.

10. The Crimes Code, supra; 18 Pa.C.S. § 903.

11. Because of this disposition, we do not decide appellant's challenge to the admissibility of the allegedly prejudicial physical evidence.

mount Park in Philadelphia where they stopped the car, ordered the victim to get out, and then locked him into the trunk of the car. The kidnappers resumed their journey. After driving for an additional 30–45 minutes, they arrived at a very remote, wooded area of Upper Merion Township in Montgomery County. At this point, the abductors freed Mr. Rigney from the trunk. A third man, who had joined the two kidnappers sometime during their trip, told Mr. Rigney to put his hands behind his back. As the victim attempted to back away, one of the attackers knocked him to the ground and tied his hands behind his back with white adhesive tape. The assailants then pulled Mr. Rigney to his feet, slipped a noose, made out of a necktie, around his head, and pulled tight. They then led Mr. Rigney to a nearby ravine and pushed him over the edge. As he fell, the victim lost consciousness.

When he regained his senses, the victim discovered that he had fallen only 5 or 6 feet and had come to rest in a plateau area of the ravine. His hands were now free, and the white tape hung from his wrists. He removed the noose and attempted to move. However, nausea overcame him, and he lost consciousness again. Several hours later, he regained consciousness and crawled out of a ravine onto an adjacent road. A passerby found Mr. Rigney and called the police and an ambulance.

The passerby and the attending police officers testified that Mr. Rigney had been severely beaten; his face was swollen, deformed and black and blue. His forehead had a deep gash, and blood covered his face and neck. His hands were similarly cut, bloody, and discolored. Ticks infested exposed areas of his skin. The victim gasped and had extreme difficulty breathing. According to Mr. Rigney, he suffered permanent loss of hearing in one ear. Moreover, he testified that the assailants removed his 16 year old Timex wristwatch, his car, his keys, and his wallet with his vehicle registration card.

A police officer testified that on May 17, 1975, two days after the sordid attack, he spotted the victim's car in an area

near the scene of the abduction. Appellant entered the car and drove off. The police officer stopped appellant and questioned him. Appellant told the police officer that he did not have a driver's license and that he had borrowed the car from a friend. When appellant could not produce a registration card, the police officer arrested him. At the police station another police officer questioned appellant about his possession of the victim's car. Appellant changed his account and asserted that on May 16, 1975, he found the car parked along the street with the keys in it and decided to take it for a ride. Appellant then elected to remain silent. Police officers also testified to a search of appellant's person and the victim's car. On his wrist, appellant wore the victim's 16 year old Timex watch. When questioned as to how he came into possession of this watch, appellant responded that he had purchased the watch, brand new, six months earlier. The police also found the victim's automobile registration card in appellant's wallet. The search of the victim's car disclosed the following items: several rolls of white adhesive tape of the same nature used in the attack, a gun, a letter addressed to appellant, several books marked with appellant's name, and many pieces of appellant's personal clothing.

On October 31, 1975, the jury returned guilty verdicts on all charges. At appellant's behest, his counsel made and argued oral post-verdict motions on the record at the conclusion of trial. See Pa.R.Crim.P. 1123(b); 19 P.S. Appendix. After denying the post-verdict motions, the lower court sentenced appellant to two consecutive 10–20 year terms of imprisonment on the kidnapping and attempted murder charges and one concurrent 10–20 year term of imprisonment on the robbery charge. This appeal followed.

Appellant first contends that the Commonwealth did not adduce sufficient evidence to prove beyond a reasonable doubt that he committed the crimes charged. In particular, appellant asserts that the only evidence linking him to the May 15, 1975 events was his possession of property stolen from the victim. "In determining whether the evidence is

sufficient in law to prove that a defendant is guilty beyond a reasonable doubt, of the crime or crimes charged, we must, after a verdict of guilty, accept as true all of the evidence, direct or circumstantial, and all reasonable inferences arising from the evidence, upon which the trier of facts could properly have based the verdict. *Commonwealth v. Malone*, 444 Pa. 397, 281 A.2d 866 (1971); *Commonwealth v. Petrisko*, 442 Pa. 575, 275 A.2d 46 (1971)." *Commonwealth v. Fortune*, 456 Pa. 365, 367, 318 A.2d 327, 328 (1974). We must view the evidence in the light most favorable to the Commonwealth. *Commonwealth v. Newkirk*, 455 Pa. 559, 317 A.2d 216 (1974). Moreover, a conviction may be based solely upon circumstantial evidence sufficient to prove a defendant's participation in the crime charged beyond a reasonable doubt. *Commonwealth v. Roscioli*, 454 Pa. 59, 309 A.2d 396 (1973).

■ In the instant case, the Commonwealth presented sufficient circumstantial evidence to support the jury's guilty verdicts. The police found appellant driving the victim's car near the scene of the abduction within 48 hours of the crimes. When questioned, appellant proffered two false and contradictory accounts of his possession of the car. The police found the victim's 16 year old Timex watch on appellant's wrist; when questioned as to his possession of this item, appellant responded with a patent falsehood. The police also found the victim's registration card in appellant's wallet. A search of Mr. Rigney's car disclosed several rolls of white adhesive tape of the same type used to bind Mr. Rigney's hands and a gun. The police also found several of appellant's personal possessions in the car. We believe that this evidence, when considered in its totality, sufficiently links appellant to the commission of the reprehensible crimes of May 15, 1975.

■ Appellant next alleges that the Commonwealth did not produce sufficient evidence of possession of an instru-

ment of crime in Montgomery County.[12] The lower court summarized the pertinent evidence on this issue and refuted appellant's contention: "There was direct testimony that [a gun] was there at the scene of the abduction, and later, that the outline of it was observed in the pocket of one of the abductors. A gun was found in the victim's car when defendant was picked up. It would be folly to imagine that the gun had not gone along with the men to Montgomery County on this entire nefarious venture, and that it did so was not an unreasonable inference for the jury to have drawn. The Commonwealth is entitled to all reasonable inferences arising from the evidence." *Commonwealth v. Thomas*, 459 Pa. 371, 329 A.2d 277 (1974); *Commonwealth v. Rankin*, 441 Pa. 401, 272 A.2d 886 (1971). We concur with the lower court's analysis and likewise reject appellant's claim.

Appellant next contends that the trial court committed reversible error in allowing a Commonwealth witness to testify that appellant elected to remain silent after his arrest. We agree and, therefore, grant appellant a new trial.

At trial, the Commonwealth called William P. O'Brien, an Upper Merion Township police officer who interrogated appellant on the night of his arrest and incarceration. Officer O'Brien testified that he advised appellant of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The prosecutor and Officer O'Brien then engaged in the following interchange.

"Q. What did you do having met Mr. Williams?

"A. I asked him for his personal identification, name, address, date of birth, inquired as to how he came into possession of a vehicle that he was operating, that of Mr. Rigney's.

12. Appellant does not contend that a gun is not a "prohibited offensive weapon" under 18 Pa.C.S. § 908. Nor does appellant argue that a gun is not an "instrument of crime" under 18 Pa.C.S. § 907. Appellant only asserts that he did not possess a gun *in Montgomery County* on May 15, 1975. Accordingly, we only decide this narrow issue.

"Q. Did he tell you how he came in possession of it?

"A. He said that on the date prior to that, the 16th, he had found the car parked along a street with the keys in it and took it for a ride.

"Q. Then what happened?

"A. After that he elected to remain silent."

The trial court denied defense counsel's motion for a mistrial and also stated that: "I don't think that anything would be served even by a cautionary instruction the way it was elicited."

In *Commonwealth v. Greco*, 465 Pa. 400, 350 A.2d 826, 828 (1976), the following dialogue occurred at trial:

"[Q.] Did Greco ever say anything to you?

"[A.] We had several conversations. I advised him to— that he had the right to remain silent, and he didn't actually make any statements other than general conversation."

The lower court denied defendant's request for a mistrial and did not give a cautionary instruction. The Supreme Court found this testimony an impermissible encroachment upon the defendant's right not to incriminate himself and granted a new trial. The Court stated:

"The law is clear. It is reversible error to admit evidence of a defendant's silence at the time of his arrest. *Commonwealth v. Stafford*, 450 Pa. 252, 299 A.2d 590 (1973); *Commonwealth v. Haideman*, 449 Pa. 367, 296 A.2d 765 (1972). The prohibition of *any reference* to an accused's silence reflects the court's desire that an accused not be penalized for exercising his constitutional rights. *Commonwealth v. Stafford, supra; Commonwealth v. Haideman, supra*; *Miranda v. Arizona, [supra ]*. It is a recognition that most lay persons would view an assertion of the constitutional privilege as an admission of guilt. *Commonwealth v. Haideman*, 449 Pa. at 371, 296 A.2d at 767, *citing Walker v. United States*, 404 F.2d 900, 903 (5th Cir. 1968)." 465 Pa. at 403, 350 A.2d at 828. (Emphasis supplied). The Court concluded that: "An admission of guilt constitutes highly prejudicial

evidence and cannot be considered harmless error." 465 Pa. at 404, 350 A.2d at 828.[13]

In *Commonwealth v. Maloney*, 469 Pa. 342, 365 A.2d 1237 (1976), our Supreme Court, in a plurality opinion per EAGEN, J., held that reference to an accused's silence at the time of his arrest could be harmless error *provided* that the trial court gave adequate cautionary instructions. In particular, the Court concluded that a cautionary instruction could cure an error abridging the defendant's right to remain silent if, for example, the nature of the reference was indirect and was not exploited by the District Attorney.

In *Commonwealth v. Hinds*, 244 Pa.Super. 182, 366 A.2d 1252 (1976), our Court concluded that the trial court committed reversible error by admitting the testimony of a police officer that the defendant, charged with involuntary manslaughter, failure to stop at the scene of an accident, and failure to stop and render assistance, proffered the following statement after being warned of his *Miranda* rights: " 'I don't want to say anything until I talk to my attorney, but I

13. In the instant case, the Dissenting Opinion asserts that "[t]he public is not unaware of the accused's right to remain silent and the duty of the Commonwealth to prove guilt beyond reasonable doubt. With this recently increased awareness, I find it more and more unlikely to suspect that prejudice arises when the exercise of the constitutional right is mentioned, particularly in an off-hand manner. I believe that the awareness of this right has been most generally disseminated through the media until we have now reached the juncture where slight, unrepeated mention of the accused's remaining silent without contextual direct or inferential potential for prejudice, is no more harmful to the accused in the eyes of jurors than prosecution statements as to allegations of guilt." At 451. However, by stating that most lay persons would view testimonial reference to a defendant's silence after arrest as an admission of guilt, *Commonwealth v. Greco, supra,* directly refutes this analysis. Moreover, the Dissenting Opinion's argument would completely eviscerate the constitutional protection afforded by the right to remain silent after arrest. Finally, even if we were to conclude that testimonial reference to a defendant's silence would have minimal impact upon a jury cognizant of a defendant's right to remain silent, the absence of affirmative justification for the testimony would warrant its prohibition. See Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Search of a Rationale,* 125 U.Pa.L.Rev. 15, 20 (1976). (Discussing prosecutorial comment on a defendant's failure to testify.)

will say this: I passed a car, and, when I did, the car splashed my windshield. I didn't see anything. I didn't see the girl. I didn't know that I hit her. I did stop and look.'" Id. 244 Pa.Super. at 190, 366 A.2d at 1256. Our Court reiterated that *Commonwealth v. Greco, supra*, prohibited *any reference* to the accused's invocation of his constitutional right to remain silent and stated that ". . . the fact that a defendant had made a voluntary statement to the police would not change our holding that testimonial reference to an accused's assertion of his rights, whether made at the time of his arrest or at some later time, is prejudicial and requires that a new trial be granted." 244 Pa.Super. 191, 366 A.2d at 1257.[14]

Finally, in *Commonwealth v. Mitchell*, 246 Pa.Super. 132, 369 A.2d 846 (1977), our Court granted a new trial because the arresting police officer gave the following testimony:

"I then asked him about the burglary at Doctors Brady, Kegel and France Offices, and he denied any knowledge of the burglary.

"I then confronted him with the lug wrench [found at the scene of the burglary] and told him that this is how I broke the case, and he immediately made recognition of the lug wrench. He said, oh, that was ripped off, stolen from my apartment sometime in April or May, along with a stereo set. He said, I have a lot of Toyota tools in my apartment.

"I then advised him that I had contradictory information regarding his possession of the lug wrench, and then he said he had no more to say and would commit suicide."

We stated that "[t]he right not to have one's silence used against one does not depend upon whether the right is asserted at the beginning of interrogation or later on." 246 Pa.Super 137, 369 A.2d at 848. We concluded that the testimony, in the absence of a cautionary instruction, could not be considered harmless error.

14. *Hinds* reaffirms our statement in *Commonwealth v. Greco*, 227 Pa.Super. 19, 23 (n. 4), 323 A.2d 132, 134 (n. 4), (1974), affirmed *Commonwealth v. Greco, supra*, that "[any] reference by the prosecution at trial to a defendants resumption of silence [after making a voluntary statement] would also be prejudicial."

██ Reading *Greco, Maloney, Hinds,* and *Mitchell* together, we believe that our appellate courts have found *any reference* to an accused's silence after arrest to be reversible error unless the trial court gives a prompt and adequate cautionary instruction. The Dissenting Opinion contends that these prior decisions are distinguishable because " . . . the references to the defendant's remaining silent [were] more than one in number and [left] no doubt, by deduction or inference, that the accused during questioning would not discuss the crime." (at 450). To the contrary, *Greco, Hinds* and *Mitchell* each involve only one testimonial reference to the accused's exercise of his right to remain silent after arrest, and *Hinds* and *Mitchell* involve attempts by the defendant to discuss the crime by offering exculpatory statements. The Dissenting Opinion also asserts that the Commonwealth's questioning only referred to the charge of theft of movable property; however, appellant's possession of the victim's car was the most damaging evidence adduced against appellant because it linked appellant to the commission of *all* offenses charged. Testimony that the appellant "elected to remain silent" after stating that he found the car parked on the street and took it for a ride impermissibly allowed the jury to infer that if appellant's initial exculpatory statements contained a grain of truth, he would have offered further explanatory details. Because the Commonwealth fails to distinguish adequately prior Pennsylvania appellate court decisions holding that *any reference* to a defendant's silence after arrest constitutes reversible error in the absence of an adequate cautionary instruction, we grant appellant a new trial.[15]

15. Even assuming that a reference to an accused's silence after arrest could be harmless error despite a trial court's failure to give a cautionary instruction, we believe that the Dissenting Opinion palpably applies the wrong standard in assessing harmlessness in the instant case. The Dissenting Opinion states: "Because it is very difficult for an appellate court from the printed record to have the same feeling for the events at trial as did the lower court judge, I should find error only when it is clear that the trial judge *abused his discretion* in denying the motion for a mistrial." (at 451) (Emphasis supplied). However, in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the United States Supreme Court

Judgment of sentence vacated and case remanded for a new trial.

VAN der VOORT, J., files a dissenting opinion in which WATKINS, President Judge, and PRICE, J., join.

VAN der VOORT, Judge, dissenting:

Appeal is taken to our Court from judgments of sentence rendered on jury findings of guilt as to charges of criminal attempt to commit murder, possession of instrument of crime and use of prohibited offensive weapon, felonious restraint and false imprisonment, robbery, simple and aggravated assault, recklessly endangering another person, theft, kidnapping, and criminal conspiracy.[1] Jury trial had been held on October 28–31, 1975, and appellant was sentenced on January 7, 1976, to two concurrent terms of 10–20 years' imprisonment on the kidnapping and robbery convictions, and to 10–20 years' imprisonment for criminal attempt to run consecutively to the above. Sentence was suspended on the possession and criminal conspiracy convictions, the other convictions warranting no sentence because they merged with the charges on which sentences were imposed. Post-trial motions were orally argued immediately after trial.

held that before a federal constitutional error can be held harmless, the beneficiary of the constitutional error, here the Commonwealth, must prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. See also M. Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of Rationale, supra.* We believe that the Dissenting Opinion fails to apply this demanding test. We note that the Commonwealth did not produce either eyewitness identification of appellant or a confession; indeed, the Dissenting Opinion concedes that the evidence against appellant was mainly circumstantial (at 453). Even if we apply a harmless error test in the instant case, despite the absence of cautionary instructions, we cannot say beyond a reasonable doubt that the federal constitutional error did not contribute to appellant's conviction.

1. In violation of the "Crimes Code", Act of 1972, Dec. 6, P.L. 1482, No. 334, 18 Pa.C.S. §§ 901, 907–908, 2902–2903, 3701, 2701–2702, 2705, 3921, 2901, and 903 respectively.

448

In his opinion, lower court Judge STEFAN has concisely and completely described pertinent facts adduced at trial, and we quote therefrom:

At eleven o'clock on the morning of May 15, 1975, seventy-eight-year-old Frank Rigney drove his 1974 Plymouth Duster into a parking lot at 69th and Walnut Streets, directly across from Gimbels Department Store, in Philadelphia, Pennsylvania. He parked the car and began to look at the headlines of his newspaper. Suddenly, a gun was pointed at his head on his left, and another gun appeared through the front passenger window at his right. Two men jumped into the car from both sides, forcing Mr. Rigney between them in the front seat.

As they began to drive, Mr. Rigney was told not to move and to look straight ahead. One of the men said to him: 'You white MF, you're going to die, man.' Mr. Rigney told them that he was seventy-eight years old; that they had his car; and he asked them to let him out. They refused and told him to shut up and look straight ahead. They drove to an isolated spot in the Strawberry Mansion section of Philadelphia, whereupon they stopped, ordered Mr. Rigney to get out of the car, picked him up and put him into the trunk of the car, and closed and locked the trunk.. Mr. Rigney testified that half to three-quarters of an hour had elapsed up to this time.

They proceeded to drive with Mr. Rigney in the trunk for another half to three-quarters of an hour. Their final destination was a very remote, wooded, secluded area of Upper Merion Township, Montgomery County, Pennsylvania, at the site of a ravine. The trunk of the car was opened and Mr. Rigney was pulled out. A third man had joined the other two somewhere along the way, and he told Mr. Rigney to put his hands behind his back. As Mr. Rigney backed away, he was struck in the stomach and fell to the ground. While he lay on the ground, his hands were tied behind his back with white adhesive tape. He was then pulled to his feet and a necktie that had been

made into a noose was slipped over his head and pulled tight. He was then led to the edge of the ravine and pushed. As he fell, Mr. Rigney lost consciousness. When he regained consciousness, Mr. Rigney discovered that he had fallen only about five or six feet down and had come to rest in a plateau area of the ravine. His hands were free and the tape was hanging from his wrists. He removed the noose from his neck and tried to move, at which time he became violently sick and then lost consciousness again. Several hours later, he regained consciousness and was able to climb slowly out of the ravine. When he could go no farther, he lay down on the road. Approximately twenty minutes later, a jogger found him and called the police and an ambulance.

Mr. Rigney had been beaten severely. According to the description of his condition given by the jogger who found him and by the policemen who arrived on the scene, his face was swollen, deformed, and black and blue from bruises. There was a very severe gash on his forehead, and his left eye was swollen closed. Dried blood covered his face and neck, and there were severe abrasions on his neck. His hands were cut and black and blue, and his ears were discolored black. His clothing was covered with dirt and debris and ticks had infested the exposed areas of his skin. He was gasping and had difficulty speaking. Ultimately, he suffered permanent loss of hearing in one ear. His sixteen-year-old Timex wristwatch, his keys, and his wallet with his vehicle registration card in it had all been taken.

Two days later, on May 17, 1975, the defendant, Gregory Williams, was spotted driving Mr. Rigney's car in an area not far from where Mr. Rigney had been abducted. The defendant was stopped and when he could not produce a registration card for the car, he was arrested and taken into custody. Mr. Rigney's watch and vehicle registration card were found on the defendant's person. A search of the car revealed a gun, several rolls of white adhesive

450

tape, a letter addressed to defendant, and several books with defendant's name on them.

Appellant now asserts four claims of trial error.

During direct examination at trial of Commonwealth witness William P. O'Brien, Upper Merion Township police officer who interrogated appellant on the night of his arrest and incarceration, the following occurred:

Q. [by Commonwealth Attorney]: What did you do having met Mr. Williams [the appellant, at his place of incarceration in the Philadelphia lock-up]?

A. [by witness O'Brien]: I asked him for his personal identification, name, address, date of birth, inquired as to how he came into possession of a vehicle that he was operating, that of Mr. Rigney's.

Q. Did he tell you how he came in possession of it?

A. He said that on the date prior to that, the 16th, he had found the car parked along a street with the keys in it and took it for a ride.

Q. Then what happened?

A. After that he elected to remain silent.

Thereupon defense counsel objected and requested a mistrial, arguing that the witness' statement about the appellant's remaining silent was unduly prejudicial. The motion was refused. Appellant now argues that such denial was error because "it is reversible error to admit evidence of a defendant's silence at the time of his arrest". *Commonwealth v. Greco*, 465 Pa. 400, 350 A.2d 826, 828 (1976). The Fifth Amendment forbids such commenting upon an accused's silence, the fear being that jurors will accept such as an indication of guilt. *Commonwealth v. Haideman*, 449 Pa. 367, 296 A.2d 765 (1972). In these cited cases, and others mentioned therein, the references to the defendant's remaining silent are more than one in number and leave no doubt, by deduction or inference, that the accused during questioning would not discuss the crime. Therein arises the fear that jurors will suspect that the man "knew something he wasn't telling." However, in the instant case, after, identi-

fying questions, only the theft of movable property charge was referred to, which precipitated the defendant's silence. There was no detailed questioning into any other aspect of the alleged criminal activities, nor was the subject's act of silence again mentioned. I consider it the duty of the trial court to assess the possibility of prejudicial inference arising from such testimony, and here the court did so. Because it is very difficult for an appellate court from the printed record to have the same feeling for the events at trial as did the lower court judge, I should find error only when it is clear that the trial judge abused his discretion in denying the motion for a mistrial. I do not so find. On the contrary, I believe the lower court's determination that no prejudice arose was justified. The public is not unaware of the accused's right to remain silent and the duty of the Commonwealth to prove guilt beyond reasonable doubt. With this recently increased awareness, I find it more and more unlikely to suspect that prejudice arises when the exercise of the constitutional right is mentioned, particularly in an off-hand manner. I believe that the awareness of this right has been most generally disseminated through the media until we have now reached the juncture where slight, unrepeated mention of the accused's remaining silent without contextual direct or inferential potential for prejudice, is no more harmful to the accused in the eyes of jurors than prosecution statements as to allegations of guilt.

As a part of its case, the Commonwealth introduced into evidence four sticks, identified by an F.B.I. investigator who analyzed the items as pieces of a broomstick. As to only one piece he "concluded that those yarns [found thereon] could have originated from this shirt [which the victim was wearing]." Notes of testimony, p. 75. Appellant objects, arguing that the jury was thus permitted to infer that at least one of these items was used to beat the body of the victim. There is no basis for such inference, these items not being such as immediately to inflame the mind or cause one instantly to recoil as from a readily-identifiable instrument

of crime. The point of their admission in this case is one of relevancy. And we hold that they were relevant to show the fall of the victim into the ravine, and his stopping at the spot where the sticks were found, together with some of his personal items. This is a fact material to the case. See *Commonwealth v. Myers*, 439 Pa. 381, 266 A.2d 756 (1970).

One of the indictments was for possession of an instrument of crime. This was a handgun found in the possession of appellant when he was stopped in Philadelphia. However there was no direct testimony as to possession of any gun in Montgomery County—the victim when released from the trunk, tied, and abandoned in Montgomery County, did not testify to seeing this handgun, which he had observed when first abducted. Appellant argues that it was error for the lower court not to have sustained his demurrer or request for directed verdict on the basis that Montgomery County had no jurisdiction over this charge. Circumstantial evidence is sufficient for indictment and conviction. The circumstantial evidence here presented that this weapon accompanied appellant during the entire event, from Philadelphia, to Montgomery County, and back to Philadelphia, together with the law allowing that, "in order to obviate the difficulty of proof as to offenses committed during journeys from place to place, in any indictment for felony or misdemeanor committed on any . . . carriage whatever employed in any journey, it shall be sufficient to allege that such felony or misdemeanor was committed within any county or place through any part whereof such . . . carriage shall have passed in the course of the journey during which such felony or misdemeanor shall have been committed . . .," make clear that Montgomery County had jurisdiction. Act of 1860, March 31, P.L. 427, § 49, 19 P.S. 525. See *Commonwealth v. Hainds,* 448 Pa. 67, 292 A.2d 337 (1972).[2]

2. On appeal, appellant argues that this possession indictment, while not within the jurisdiction of the trial court, moreover prejudiced appellant by its being part of the trial. This argument was not advanced during post-trial motions, and is waived for our purposes.

Appellant's final argument is that the weight of the evidence is insufficient to sustain the conviction. The evidence against appellant, viewed more favorably to the verdict winner, is mainly circumstantial because the victim was ordered not to look to either side at his captors immediately upon having been taken, and he was unable to see them when released from the trunk, tied, and pushed into the ravine because of the rapidity of events. The circumstantial evidence in this case was sufficient to convict. *Commonwealth v. Roscioli*, 454 Pa. 59, 309 A.2d 396 (1973). As stated so excellently by Judge STEFAN in his opinion:

The evidence presented in the instant case, including the circumstances surrounding defendant's possession of stolen property, are sufficient to support the verdicts of the jury. Defendant was found driving the victim's car within approximately forty-eight hours of the crime, in an area not far from the scene of the abduction; he gave two false and conflicting stories of how he happened to have possession of the car; he was wearing the victim's sixteen year-old Timex watch; he was carrying the victim's vehicle registration card in his own wallet in his own pocket; a gun was found inside the car; and, several other items belonging to defendant were found inside the vehicle. Defendant's assertion that there was nothing to indicate that a gun existed in Montgomery County is without merit. There was direct testimony that it was there at the scene of the abduction, and later, that the outline of it was observed in the pocket of one of the abductors. A gun was found in the victim's car when defendant was picked up. It would be folly to imagine that the gun had not gone along with the men to Montgomery County on this entire nefarious venture, and that it did so was not an unreasonable inference for the jury to have drawn.

I would affirm.

WATKINS, President Judge, and PRICE, J., join in this Dissenting Opinion.