442 A.2d 314

**COMMONWEALTH of Pennsylvania**

v.

**Raymond WILLIAMS, Appellant.**

Superior Court of Pennsylvania.

Argued Aug. 31, 1981.

Filed March 5, 1982.

98

Paul R. Gettleman, Zelienople, for appellant.

Stella L. Smetanka, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Before WICKERSHAM, WIEAND, and BECK, JJ.

BECK, Judge:

Appellant was arrested and charged on January 30, 1978 with robbery, theft by unlawful taking, violation of The Uniform Firearms Act and criminal conspiracy. After a jury trial, appellant was found guilty on all counts and sentenced to from ten to twenty years incarceration. Post-verdict motions were subsequently denied. This is a direct appeal from the judgment of sentence.

We reverse and remand for a new trial based upon a question by the trial judge about appellant's post-arrest silence. That question was asked immediately after appellant had presented his alibi and had been cross-examined by the prosecutor who judiciously avoided referring to appellant's silence. The trial judge cast doubt upon appellant's alibi by questioning him about the aforementioned silence, thereby attenuating his Fifth Amendment right to remain silent:

Trial Judge:

> The only other question I have is, the police testimony seemed to leave me to conclude that they asked you to make a statement, you made no statement to them at all. You didn't tell them anything at all about the man you were with, with Mr. Fuller up in New Kensington?

Appellant: No, I didn't. (N.T. 157.)

Appellee relies upon *Commonwealth v. Zellner*, 268 Pa.Super. 59, 407 A.2d 436 (1979) which cites the language of *Commonwealth v. Maloney*, 469 Pa. 342, 365 A.2d 1237 (1976) for the proposition that if the trial judge in his charge adequately cures his earlier indiscretion, the trial judge has not committed reversible error. Those cases are distinguishable from the instant case, however, in that they involve prosecutorial error, rather than judicial. In both cases, a police officer, in answer to the prosecutor's question, referred to defendant's silence after being read his *Miranda* rights.

While we find a prosecutor's question less prejudicial than a judge's, our appellate courts as well as the United States Supreme Court have reversed even where the prosecutor made that inquiry. *See Commonwealth v. Easley*, 483 Pa. 337, 396 A.2d 1198 (1979); *Commonwealth v. Greco*, 465 Pa. 400, 350 A.2d 826 (1976). In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the Supreme Court held such prosecutorial inquiry to constitute a denial of due process:

> (W)hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. Mr. Justice White, concurring in the judgment in *United States v. Hale*, supra, [422 U.S. 171] at 182–183, 95 S.Ct. 2133 [at 2139] 45 L.Ed.2d 99, put it very well:

"(W)hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony . . . Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from *Miranda* warnings that this would not be the case."

426 U.S. at 618–619, 96 S.Ct. at 2245 (footnotes deleted). The Supreme Court did note an exception to the above rule in *Doyle v. Ohio*, 426 U.S. at 619 n.11, 96 S.Ct. at 2245 n.11, but that exception is inapposite to the instant case. It embodies the situation where the defendant testifies to an exculpatory version of the events and contends that he told the police officers that same version when arrested. In that very narrow case, the fact of earlier silence may be used to impeach this account of what transpired upon arrest.

■■■ An accused's Fifth Amendment right to remain silent after arrest is unequivocal. Any mention of the fact that a defendant availed himself of that protection must be scrupulously avoided. The judge's question and its timing could reasonably have led the jurors to conclude that defendant fabricated the alibi after arrest, and that his silence constituted an admission of guilt. We therefore conclude that the question was prejudicial and did not constitute harmless error.

While it is apparent that the trial judge did attempt to cure his indiscretion, the prejudicial effect of the question and its timing outweighed the curative impact of the instruction. *See Commonwealth v. Seel*, 267 Pa.Super. 490, 406 A.2d 1148 (1980).

We reverse the judgment of sentence and order a new trial.

WICKERSHAM, J., files a dissenting opinion.

WICKERSHAM, Judge, dissenting:

On October 5, 1978, a jury returned a verdict of guilty against the appellant, Raymond Williams, on charges of robbery, theft by unlawful taking or disposition, firearms not to be carried without a license and criminal conspiracy. Appellant was sentenced to pay a fine and costs and to serve a prison term of ten to twenty years on the charge of robbery. Sentence was suspended as to the other charges on payment of costs of prosecution. The trial had been held before the Honorable James R. McGregor, with Bruce Carsia representing the appellant, Williams.

One of the witnesses for the Commonwealth was Mary Shrader, who testified that she was a clerk at the Stop N Go in Springdale, Allegheny County and was working on January 30, 1978. Her testimony included the following:

Q Did anything unusual happen that day that you would like to tell us about?

A Yes, a robbery occurred that evening.

. . . .

Q And would you tell us in your own words what happened?

A At five minutes to 6:00, two blacks entered the store and proceeded to rob the place.

Q ... How did it take place initially, would you tell us what happened?

A Well, I was placing pop up in one corner of the store and the door opened, and I went to greet the customers, which were two blacks at which point the taller of the two placed a gun in my righthand side and accompanied me around the counter to the register, demanded money from the register.

Q When he placed the gun at your side, was there another man with him?

A   Yes, ma'am.

. . . .

Q   What exactly did he say to you when he put the gun at your side?

A   He said, "Give me the money."

N.T. at 10–11.

Patrolman John Pavshak of Harmar Township was also working on the same evening and testified:

A   I received an alert from Tarentum Base, the dispatcher for our area, our police department, the alert came over of a silver vehicle containing two black males, both armed, committed a robbery in Springdale Borough and they were headed south on Route 28.

Q   Was there a license plate mentioned?

A   Yes, there was.   The silver vehicle was to bear Pennsylvania Registration 9C7–651.

Q   Did you see this vehicle?

A   Yes, I did.

Q   How soon after this broadcast did you see the vehicle?

A   At 6:10 p. m.

Q   Where did you first sight it?

A   On Route 28 heading south near the intersection of Route 28 and Jefferson Avenue.

. . . .

Q   Could you give us a distance between the intersection of Route 28 and Jefferson Road and the Stop N Go?

A   Approximately two miles.

Q   What action did you take at that point?

A   This vehicle passed me, I verified the registration number as being the same which was given to me in the alert, and I pulled directly behind the vehicle, gave an audible signal with the siren for the vehicle to stop.   My vehicle was a marked police vehicle with red emergency lights, which were also on.

Q   Could you see at that point how many people were in the car?

A   Yes, there were two black males.

N.T. at 74–75.

A   I followed the vehicle proceeding south on Route 28, I followed the vehicle in the wrong lane at high speeds. We came down near the intersection of Route 28 and the Pennsylvania Turnpike Ramp, the entrance ramp of the Turnpike. At this point, Route 28 becomes a four lane highway, where earlier it was a three lane highway. This became a four lane highway and I proceeded to chase the vehicle. Approximately one-eighth of a mile past the entrance to the ramp, there is a bridge which is an exit ramp that is over top of Route 28. At this point, the one Actor in the vehicle, the passenger, stuck his arm out the window. We were in the curb lane, in the right lane, he stuck his arm out of the window and he was displaying a revolver. He held the revolver several seconds and discarded the revolver along the highway into the snow. I watched where the revolver fell. I immediately called Springdale Borough Police Officer Victor Di Santi to secure the area for the recovery of the weapon.

. . . .

Q   During that chase up to this point where you saw the revolver being thrown, could you estimate how fast you were going during the chase?

A   Between the speeds of approximately sixty and eighty miles per hour.

Q   Did the car keep going after you saw the gun being thrown?

A   Yes, it proceeded south to the intersection of Route 28 and New Route 910. At this point, the vehicle made a right turn, it went approximately one-quarter of a mile until we came to the intersection of New Route 910 and Gulf Laboratory Road. At this point, the vehicle made another right turn, went a distance of approximately one hundred feet and made a left turn onto to Old Route 910. Old Route 910 is a very narrow road and it is a dead end road. The vehicle proceeded on Old Route 910 until it came into physical contact with a dump truck which was blocking the roadway. This dump truck was completely

blocking the road, there was nowhere to go. The suspected vehicle struck the dump truck broadside. . . .

. . . .

Q  Were the men in the car at the time you approached the car?

A  No, they were not.

. . . .

A  As I pulled the keys out of the vehicle, I looked, I could see the footsteps from the vehicle. At this point, Officer Allen Park from Cheswick Borough Police Department arrived. I radioed my location all during the chase, and Officer Park arrived. We began to follow the two sets of footprints from the vehicle, heading in towards a wooded area.

Q  . . . . Would you describe to us what the area was like surrounding this car?

A  This is an isolated area, it is somewhat wooded, very hilly, dead end road, and there are no occupants or residents in there.

N.T. at 76–78, 79.

Q  You apprehended a suspect a thousand yards away?

A  Yes.

Q  Where exactly was he?

A  He was halfway up this steep hillside. It is a wooded area. He was entering the wooded area and he was crouched along the hillside.

Q  Do you see that man in court today?

A  Yes, I do.

Q  Point him out please?

A  Raymond Williams, the Defendant.

Q  What was his physical condition at that time?

A  He appeared to be very exhausted and wet.

. . . .

Q  Did you continue a search for any other evidence that evening?

A  . . . [W]e went back the same route in which we came, Old 910, Gulf Lab Road, New 910 and Route 28

North. When we come to the area where the gun was discarded, this area was secured by police officers from another municipality. I had the one Defendant in my car and Officer DiSanti had another Defendant in his car. We stopped at this area where the gun was discarded. I walked over to that area and picked up a revolver. This was a .32 caliber S&W manufactured by H&R Model No. 632, Serial No. AP349 . . . .

Q Was this the area you saw the gun being discarded?

A Yes, the exact same spot.

N.T. at 81, 82.

A The following day, at approximately 5:40 p. m., this would be on the 31st of January. Myself and Officer Park went back into the area. Whenever I say back in the area, I mean the wooded area where the suspect was apprehended. On the middle of this hillside, this cliff area, when we got to the area where he was apprehended, halfway up the hill, within a very short distance of the apprehension site, there were crevices in the hillside. At this point, myself and Officer Park retrieved $53.00 of currency.

Q At this point, was it contained in anything?

A No, it was not.

Q It was loose?

A Yes.

Q You say a short distance away, can you be any more specific and give me an estimate of the distance from where you apprehended Mr. Williams and you found the money?

A Approximately one foot.

Q Was there anything unusual about any of the money you noticed?

A Yes. There were five one-dollar bills which had an ink stamp, blue or black ink stamp of Stop N Go.

N.T. at 84.

The prosecuting officer, Victor DiSanti, who was a policeman for Springdale Borough, testified as to what occurred

following the arrest of the two suspects, including appellant Williams.

A  ... After the gun was turned over to me by Officer Pavshak, I proceeded towards Tarentum Police Station, which is our lockup where we incarcerate anybody, we use their facilities for investigation.

Q  Did you see either or both of the men that were apprehended there?

A  Yes, they were there.

Q  Did you do anything with regard to these two men?

A  Yes. At the time that they were taken to the Station, they were given their rights.

Q  Now, after they were advised of their rights, did you conduct any further search or anything of that nature?

A  Yes. The individuals were asked to remove everything from their pockets. I, again, went to search the vehicle and conducted a pat down search of them and asked them to remove everything from their pockets.

Q  Did you find anything in their pockets?

A  Yes, I did.

Q  With respect to Mr. Williams seated here, what, if anything, did you find?

A  Mr. Williams had some shells in his pocket.

Q  What do you mean by 'shells'?

A  He had some .32 caliber shells in his right front pant pocket.

N.T. at 106–107.

At the conclusion of the Commonwealth's case, the defendant, Raymond Williams, appellant here, testified on his own behalf. He denied any involvement in the armed robbery at Stop N Go. He stated that on the day in question he just happened to run into his friend, William Fuller, at the Holiday Inn, New Kensington. He had known Fuller since they were both children. He advised Fuller that he was going home to Verona and asked Fuller for a ride.

Q  Now, what happened, did you get in the car?

A  Yes, I did.

Q  Where was Mr. Fuller supposed to take you?

A  Back to Verona, Pennsylvania.

. . . .

Q  Now, what happened?

A  Well, on the way back, I'm not familiar with the highway, I think it was Allegheny Boulevard where we turned off on the way back, and the police had pulled up in back of our car, and as they pulled up in back of the car, he put his red light on, and Fuller begin with the high speed, you know, so I asked him, 'Man, what the hell are you doing,' you know, and he said, 'Just hang on,' you know. So, during the chase, the window was halfway down, I don't know what type of object was thrown out the window, but he did throw an object out the window, what it was, I don't know. At the time, I was frightened, you know, because I'm wondering what is happening. So, he went on to this dead end road, like wrecked into a truck, told me to get out. I get out and I ran and I tell him, 'This is it, man,' I said, 'What's happening' and he never did say, he kept going, and later on, when they caught him—

Q  Is that when the policeman caught you? Did the police come and find you in the woods there?

A  That's right.

N.T. at 137–38.

At the conclusion of cross-examination by the attorney for the Commonwealth, the following occurred:

THE COURT:  I just have two questions.

By the Court:

Q  You said that you knew that this tan or brown—dark tan Oldsmobile was Fuller's car; how did you know that was Fuller's car? Had you ridden in it before?

A  Yes, I had rode in it previously, before, and seen him several times.

Q  You had seen him in possession of that car?

A  Yes.

Q  So, on previous occasions, you knew that was Fuller's car?

A  Yes.

Q  The only other question I have is, the police testimony seemed to leave me to conclude that they asked you to make a statement, you made no statement to them at all. You didn't tell them anything at all about the man you were with with Mr. Fuller up in New Kensington?

A  No, I didn't.

N.T. at 156–57.

There was no further testimony offered in the trial. Following closing arguments of counsel, the court charged the jury and in the course of which said:

> You also heard, Ladies and Gentlemen, the testimony of the Police Officer that Mr. Williams at the time he was apprehended was given certain rights. They did not spell out these rights. One of the rights that he was given was the right to remain silent, which is absolutely guaranteed to Mr. Williams and to you and to me and to everybody in this courtroom. We are guaranteed by our Constitution of this right. No inference whatsoever can be given from the fact that Mr. Williams exercised his right to remain silent.

N.T. at 173–74.

Appellant seeks to have his conviction reversed by contending that the trial judge committed error in bringing to the jury's attention that Raymond Williams had remained silent at the time of his arrest.

> In the instant case, the trial court questioned the appellant in front of the jury, not only as to his silence at the time of his arrest, but asked him in front of the jury why he didn't tell the police his alibi at the time of his arrest. The jury could only reason, based upon the questioning by the court, that appellant's alibi was created by him after his arrest, thereby destroying his credibility with the jury and his entire defense.

Brief for Appellant at 5.

Under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), it is clear that a state prosecutor may not

seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest. Use of the defendant's post-arrest silence in that manner violates due process.

Despite the importance of cross-examination, we have concluded that the *Miranda* decision compels rejection of the State's position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan v. Tucker*, 417 U.S. 433, 443–444, 94 S.Ct. 2357 [2363–64] 41 L.Ed.2d 182 (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States v. Hale*, 422 U.S., at 177, 95 S.Ct. 2133 [at 2137] 45 L.Ed.2d 99. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. Mr. Justice White, concurring in the judgment in *United States v. Hale, supra*, at 182–183, 95 S.Ct. 2133 [at 2139–40] 45 L.Ed.2d 99, put it very well:

'[W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not

speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony. . . . Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from *Miranda* warnings that this would not be the case.'

We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment.

*Id.,* at 617–619, 96 S.Ct. at 2244–45, 49 L.Ed.2d at 97–98 (footnotes omitted).[1]

I would hold that the trial judge's question to the appellant following Commonwealth's cross-examination was harmless error cured by adequate instructions subsequently given by the trial judge.

In *Commonwealth v. Zellner,* 268 Pa.Superior Ct. 59, 407 A.2d 436 (1979), this court summarized the numerous decisions of the Pennsylvania appellate courts on the prejudice that may result from reference to an accused's election to remain silent upon arrest. In *Zellner,* this court decided to adhere to the doctrine espoused by Justice Eagen, writing for a plurality of the supreme court, in *Commonwealth v. Maloney,* 469 Pa. 342, 365 A.2d 1237 (1976):

'In order that there will be no confusion henceforth, we now specifically rule that in Pennsylvania adequate instructions under some circumstances may cure error of the nature here complained of. Initially, whether the harm

1. In *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held the use for impeachment purposes of an accused's silence at the time of arrest, after receiving *Miranda* warnings, violated his right to remain silent. The Court, however, noted in its opinion that 'the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.' *Id.* at 619 n.11, 96 S.Ct. at 2245 n.11, 49 L.Ed.2d at 422 n.11 (citation omitted).

can be removed by curative instructions will be within the sound discretion of the trial judge and his determination will be subject to appellate review. In making this decision, the following will be important considerations but not necessarily exclusive: (1) the nature of the reference, particularly, whether it was a specific comment on the accused's silence at trial or at the time of arrest or whether it was, as in *Commonwealth v. Ross* [403 Pa. 358, 169 A.2d 780 (1961)], merely a reference to the fact that incriminating evidence of the Commonwealth was undenied or uncontradicted; and (2) whether the accused's silence was exploited by the district attorney.' *Id.* [469 Pa.] at 349, 365 A.2d at 1241.

*Id.,* 268 Pa.Super. at 63, 407 A.2d at 438.

In the instant case, the trial court's question did elicit the fact that appellant had remained silent at a time when appellant had the constitutional right to do so. There was, however, no reference to and no exploitation of the accused's silence by the Commonwealth attorney. Contrary to appellant's recollection of the facts, *supra* at 319, there was also no inquiry by the trial court as to why appellant did not tell the police his alibi at the time of arrest. No further testimony was presented following appellant's response that he did not make any statements to the police. Closing arguments by counsel were heard, and within a short time of the testimony in issue, a clear, precise and explicit instruction explaining the defendant's right to remain silent was given to the jury by the court. Under these circumstances, I conclude that the instruction checked any prejudice created by the earlier reference to the accused's silence.

I do not find the case of *Commonwealth v. Seel,* 267 Pa.Superior Ct. 490, 406 A.2d 1148 (1979) controlling here. In that case the trial judge elicited testimony that appellant had chosen to remain silent at the time of his arrest by questioning the arresting officer as to appellant's answers to the officer's interrogation. The trial judge actually commented, "I think the jury is entitled to know this." Moreover, the *per curiam* decision did not detail the curative instructions found to be inadequate.

112

It is a violation of the accused's constitutional rights against self-incrimination to make reference to his silence while in police custody. *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 1624 n. 37, 16 L.Ed.2d 694, 720 n. 37 (1966); *Commonwealth v. Singletary*, 478 Pa. 610, 387 A.2d 656 (1978). Not every such reference, however, requires a new trial. *Commonwealth v. Maloney*, 469 Pa. 342, 365 A.2d 1237 (1976). *Commonwealth v. Quartman*, 253 Pa.Super. 460, 385 A.2d 429 (1978). Prompt and adequate cautionary instructions can cure what might otherwise be reversible error. *Commonwealth v. Williams*, 252 Pa.Super. 435, 381 A.2d 1285 (1978).

*Commonwealth v. Humphreys*, 267 Pa.Superior Ct. 318, 325, 406 A.2d 1060, 1064 (1979).

I dissent.