J-A15016-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TYLER HOGAN LAMPE | : | |
| | : | |
| Appellant | : | No. 1205 EDA 2019 |

Appeal from the Judgment of Sentence Entered March 26, 2019
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0003528-2016

BEFORE: LAZARUS, J., KING, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.:                    Filed: October 22, 2020

Tyler Hogan Lampe appeals from the judgment of sentence, entered in the Court of Common Pleas of Chester County, following his convictions by a jury for one count each of rape of an unconscious person[1] and sexual assault,[2] and two counts each of aggravated indecent assault[3] and indecent assault.[4] Upon careful review, we affirm.

The trial court set forth the facts of the case as follows:

On March 17, 2016, [Lampe] was a 19-year[-]old cadet in his freshman year at West Point. That night, [Lampe] went to West

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 3121(a)(3).

[2] 18 Pa.C.S.A. § 3124.1.

[3] 18 Pa.C.S.A. §§ 3125(a)(1), (a)(4).

[4] 18 Pa.C.S.A. §§ 3126(a)(1), (a)(4).

Chester University to visit friends, Jake Myers and Allison Tomassini. [Lampe] drank alcohol at [] Tomassini's apartment. [Lampe] and Myers then attended a St. Patrick's Day party, where more alcohol was consumed. Throughout the night, [Lampe] drank a large amount of alcohol. [Lampe and Myers] then went back to Tomassini's apartment, where they planned on sleeping that night. [] Tomassini lived with [L.H., the victim,] and Nora Hughes. [L.H.] met [Lampe] at her apartment that night, but did not go out with [Lampe] and [Myers]. [L.H.] also consumed a large amount of alcohol that night. At some point during the night, [Lampe] stated that if he didn't "smash" (have sex with) someone, he might try to get with [L.H.].

At approximately 2:00 a.m. on March 18, 2016, [Lampe] entered [L.H.'s] room after she had gone to bed. Both of their clothes were removed, folded, and placed in a pile. Tomassini could hear "sex sounds" coming from the room [next to her own]. She became upset and told Myers [what was occurring via phone call]. [] Myers and [] Hughes then entered [L.H.'s] room. [L.H.] awoke to [Lampe] being on top of her with his penis inside of her vagina and [] Myers yelling, "get off of her, get off of her." N.T. [Trial,] 10/9/18, [at] 46-47.

\* \* \*

Due to the consumption of alcohol, neither [Lampe] nor [L.H.] has any recollection of the incident. [] Hughes, however, testified that she was not drinking that night and instead was studying for a test. [*Id.* at] 10. [Hughes] stated that when Tomassini called [] Myers [on the phone], [Hughes] and [] Myers ran upstairs. [*Id.* at] 25. [] Hughes testified that she walked into the room where [Lampe] and [L.H.] were[,] right behind [] Myers. [Hughes] saw that [Lampe] was having sex with [L.H.], holding [L.H.'s] legs while [L.H.'s] eyes were closed, she was not moving[,] and her body was limp. [*Id.* at] 31-32, 66. [] Hughes testified that [L.H.] was unconscious and passed out. [*Id.* at] 66. [Hughes] yelled at [Lampe] to get off [L.H.] and [] Myers had to pull [Lampe] off of [L.H.]. [*Id.* at] 33. [] Myers, [Lampe's] lifelong best friend, testified that he heard [L.H.] say, "yes, Tyler," two separate times. [] Hughes rebutted [] Myers['] testimony, stating that [L.H.] never said "yes, Tyler," and she heard [] Myers tell another person over the phone[, minutes after the incident, that] "Tyler raped her." [*Id.* at] 67-68.

- 2 -

On March 18, 2016, [L.H.] reported the incident to police. She went to the hospital where she underwent an examination. Erythema (redness) was observed on both the left and right vaginal walls. Dr. Diane Kane of the Chester County Hospital testified that when a woman is aroused, there is natural lubrication in that area. N.T. [Trial,] 10/10/18, [at] 221. The inference is that [L.H.] was unconscious, and therefore, not aroused, which is why she suffered this injury to her vaginal walls.

At the direction of the police, [L.H.] participated in a wiretapped, recorded conversation with [Lampe]. [Lampe] admitted that he was so drunk, he had no idea what happened, but that he knew that [L.H.] would not have consented [].

Trial Court Opinion, 12/16/19, at 3-5. After a four-day trial, a jury found Lampe guilty of the above crimes. The court subsequently sentenced Lampe to three to six years' incarceration. Lampe filed a post-sentence motion *nunc pro tunc*, and a "supplement," both of which the court denied. Both Lampe and the trial court complied with Pa.R.A.P. 1925. On appeal, Lampe raises the following issues for our review, which we have renumbered for ease of disposition:

1. Whether the trial court erred in denying [] Lampe's motion for judgment of acquittal due to an insufficiency of the evidence for unconsciousness and nonconsent?

2. Whether the trial court erred in denying [] Lampe's motion for judgment of acquittal as the verdict was against the weight of the evidence for unconsciousness and nonconsent?

3. Whether the trial court erred in its [R]ape [S]hield rulings?

4. Whether the trial court, outside of the presence of the jury, erred in admonishing two exculpatory witnesses under threat of contempt against testifying truthfully and completely?

5. Whether the trial court erred in instructing the jury that "intoxication is not a defense"?

6. Whether the trial court erred in failing to instruct the jury they could adjourn for the evening before first rendering a verdict?

- 3 -

7. Whether the trial court erred in denying [] Lampe's request for a new trial due to juror misconduct, or, in the alternative, denying [] Lampe's request for a hearing to explore and develop evidence of juror misconduct?

Appellant's Brief, at 4-5 (some capitalization omitted).

Lampe first challenges the sufficiency of the evidence for each of his convictions. Lampe claims that none of his convictions is supported by sufficient evidence because L.H. was not unconscious and, furthermore, because the Commonwealth failed to prove L.H.'s lack of consent. *See* Appellant's Brief, at 35-45. We disagree. There was sufficient evidence to support each of Lampe's convictions.

Our standard of review for a challenge to the sufficiency of the evidence is well-settled:

> In examining a challenge to the sufficiency of the evidence, we must determine whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth, there is sufficient evidence to enable the fact[-]finder to find every element of the crime beyond a reasonable doubt. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. The established facts and circumstances do not have to be absolutely incompatible with the accused's innocence, but any doubt is for the fact[-]finder unless the evidence is so weak and inconclusive that no probability of fact can be drawn from the totality of the circumstances as a matter of law.

*Commonwealth v. Lyons*, 833 A.2d 245, 258 (Pa. Super. 2003) (internal citations omitted).

Lampe claims that the Commonwealth failed to establish the offenses of rape, aggravated indecent assault, and indecent assault of an unconscious

- 4 -

person because the Commonwealth failed to prove that L.H. "[was] unconscious or [that Lampe knew] that [L.H. was] unaware that the sexual intercourse [was] occurring, and [] knew or recklessly disregarded the fact that [L.H.] was unaware that the intercourse was occurring." Appellant's Brief, at 36 (emphasis omitted).[5] Specifically, Lampe points to witness testimony that L.H. was making audible sex noises, which were heard through the closed-door bedroom walls, to demonstrate that L.H. was not unconscious.[6] Lampe concludes that "[s]omeone who is asleep or unconscious

_____

[5] *See* 18 Pa.C.S.A. §§ 3121(a)(3), 3125(a)(4), and 3126(a)(4), which all require proof that the "**complainant is unconscious or the person knows that the complainant is unaware**" during the commission of the crime. (emphasis added).

[6] At trial, Myers testified that "we get up to the door of [L.H.] and Tyler's room where you can still hear the noises and then I'm like[,] it's definitely confirmed what I'm about to walk in on." N.T. Trial, 10/9/18, at 171. When asked what he saw when he opened the door, Myers testified "Silhouettes. It was pretty dark in there. So I can just kind of see bodies moving into each other. It's mostly just noises. I can hear, it was easy to tell what was going on." *Id.* at 178. Finally, Myers agreed that he "interrupted [Lampe] having what [Myers] thought at the time was consensual sex." *Id.* at 179. In response to who was making noises, Myers testified "[b]oth of them are moaning. [L.H.] is moaning a little bit louder. She says: [']Yes[,] Tyler['] twice. . . ." *Id.* at 217.

Tomassini testified that after Lampe left her room, "it was moments later I hear[d] sex noises." *Id.* at 262. When asked to clarify what "moments" meant, Tomassini stated, "I was not looking at the time. I wasn't paying attention to the time. I was just laying in my bed. The next thing I know, I heard sex noises." *Id.* On cross-examination, Tomassini testified that she could hear noises coming from L.H., but not from Lampe. *Id.* at 310-11.

- 5 -

[does] not make sex noises[,] . . . walk[], talk[], or us[e] the bathroom." ***Id.*** at 40.

Our Supreme Court defined the term "unconscious" for purposes of interpreting section 3121(3) of the Crimes Code in ***Commonwealth v. Erney***, 698 A.2d 56 (Pa. 1997). In that case, the appellant argued that the statute only protects victims who were "completely unaware of the event throughout the duration of the sexual assault upon them." ***Id.*** at 59. The Court, in rejecting appellant's claim and finding the evidence sufficient, stated:

> When the assault began, [the victim] displayed no awareness of external events. As the crime progressed, she believed that she was shouting for appellant to stop, but was completely unable to perceive how she was communicating—i.e., that she was merely mumbling. She offered no response when [] questioned [] during the assault. Additionally [the victim] had no knowledge of what ultimately brought an end to appellant's actions[.] . . . Her complete lack of awareness of the duration of the assault further indicates that she was not conscious throughout its entirety. Thus, despite her ability to perceive some aspects of the incident, her lack of knowledge of much of what occurred supports the finding that she was unconscious during portions of the assault and was, therefore, unable to consent to sexual intercourse. Because there was ample evidence from which the jury could properly find that the victim, during at least portions of the assault, lacked knowledge or awareness of both her own sensations and external events, and was not in the normal waking state, the evidence was sufficient to support the finding that she was unconscious within the meaning of the statute.

_____

Hughes testified that when she entered the room, L.H. "was making noises, but like not like words or anything." N.T. Trial, 10/10/18, at 32. Hughes further testified that, upon entering the room with Myers, she noticed that L.H. was "laying on the bed," ***id.*** at 66, "her eyes are closed," ***id.***, "[a]nd she's limp," ***id.***, and "from that[, Hughes] perceive[d] that [L.H.] was unconscious or passed out." ***Id.*** Hughes also testified that L.H. was making noise, and that Lampe was not. ***Id.***

*Id.* The Court concluded that "the evidence support[ed] the findings that the victim was intermittently unconscious throughout the assault and was at all relevant times in such impaired physical and mental condition so as to be unable to knowingly consent, [therefore] her submission to intercourse was involuntary." *Id.* *See also Commonwealth v. Diaz*, 152 A.3d 1040 (Pa. Super. 2016), (interpreting the term "unconscious" for purposes of sections 3121(a)(3) and 3126(a)(4) and finding sufficient evidence of unconsciousness where victim testified she was so intoxicated she was "blacking in and out"; victim remembered some events preceding and during assault, but not all; and victim could not communicate, and felt paralyzed, during assault).

Here, the evidence similarly showed that L.H. was, at the very least, "intermittently unconscious" at the time of the assault. *See Erney*, *supra*. L.H. fell asleep with her clothes on and went to bed after a night of drinking. *See* N.T. Jury Trial, 10/9/20, at 45. She testified that the next thing she remembered was "waking up to [] Myers' voice, and [] a light coming in front of the bedroom from the hallway, and [Lampe] standing—or not standing. I remember him over top of me." *Id.* at 46. L.H. testified that she felt a penis inside of her vagina but she "didn't know who[se] it was." *Id.* at 47. She testified that she did not willingly have sex with Lampe and that she did not know he was inside of her until she was awakened by Myers. *Id.* L.H. testified that she heard Myers "yelling: Get off her. Get off her[,]" and then Lampe was "pulled off" of her. *Id.* After waking up, L.H. was confused and started crying. *Id.* She was also naked but had no memory of removing her clothing.

*Id.* at 48. L.H. had no recollection of going to the bathroom after being woken up, even though Hughes testified that she brought her there immediately after the assault. *Id.* at 48. L.H. testified that she was still under the influence of alcohol when she went back to bed after the assault. *Id.* at 49. L.H. further testified that when she woke up the next morning, she "thought that I had been raped, but I was not exactly—I didn't even understand what had happened or how it could have happened really." *Id.*

Instantly, like in *Erney*, the evidence supports the conclusion that L.H. "was intermittently unconscious throughout the assault and was at all relevant times in such impaired physical and mental condition so as to be unable to knowingly consent such that her submission to intercourse was involuntary." *Erney*, *supra* at 59 (footnote omitted). Viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, the Commonwealth proved beyond a reasonable doubt that L.H. was unconscious within the meaning of the relevant statutes; consequently, the evidence was sufficient to sustain each of Lampe's convictions under sections 3121(a)(3), 3125(a)(4), and 3126(a)(4). *See Lyons*, *supra*.

Lampe also claims that the Commonwealth failed to prove L.H.'s lack of consent under sections 3124.1, 3125(a)(1), and 3126(a)(1).[7] However, we must reject this claim because the Commonwealth established L.H.'s lack of

---

[7] Each of these statutes requires proof that defendant acted "**without the complainant's consent**." (emphasis added).

consent through her unconscious state. ***See Diaz***, ***supra*** at 1044 (finding

evidence sufficient to sustain appellant's convictions for sexual assault and

aggravated indecent assault where Commonwealth established lack of consent

by victim's unconscious state.) Therefore, the evidence was sufficient to

sustain each of the elements of Lampe's convictions under sections 3124.1,

3125(a)(1), and 3126(a)(1) beyond a reasonable doubt.[8] ***See Lyons***, ***supra***.

_____

[8] Lampe argues under the sufficiency heading of his brief that,

> [i]t is practically impossible that, within such a short period of time, Mr. Lampe, uncharacteristically and drunkenly deviant (as argued by the Commonwealth in summation), stumbled into [L.H.'s] room, navigated past [a] sleeping [friend] in another bed [next] to [L.H.'s] bed in the back corner, removed his jeans and shirt, removed her shorts, stockings, and underwear—each from her hips, down and off her legs—removed her shirt over her head and her bra from around her back, all without her assistance while she was unconsciously limp *at 5'10" and 170 pounds*, placed his and her clothing in a neat pile, *then* lifted up her legs and penetrated her and caused her to make sex noises heard through the walls **all without waking her up**. No reasonable jury could make sense of this. Such a theory to convict on rape goes against human experience and the laws of nature. . . .
>
> . . . Mr. Lampe was distinguished as the perpetrator because [L.H.] recounted intermittent facts about the encounter, but not those specifically concerning her own behavior, and stated after-the-fact that she did not provide consent because she was asleep. This is distinguished from Mr. Lampe who had completely no memory of the event. Should this Court decide, notwithstanding sex noises, that any alleged inability to recall certain portions of an incident due to independently induced intoxication is sufficient to show a complainant is unconscious and unable to form consent, then the same principle applies to Mr. Lampe. As he had absolutely no memory of this encounter, he too was unconscious

Next, Lampe raises a challenge to the weight of the evidence. Specifically, Lampe claims that Hughes' testimony was fraught with uncertainty because she stated she did not know or was unsure of pertinent facts upwards of twenty times; there was inconsistency as to how much alcohol L.H. had to drink; there were discrepancies about the amount of clothing Lampe removed from L.H. while she was unconscious; L.H. remembered what occurred before and after the assault, but nothing during; and all of the witnesses who testified agreed that they heard L.H. making sex noises. *See* Appellant's Brief, at 46-53.

Our standard of review for a challenge to the weight of the evidence is well-settled:

> A motion for a new trial alleging that the verdict was against the weight of the evidence is addressed to the discretion of the trial court. An appellate court, therefore, reviews the exercise of discretion, not the underlying question whether the verdict is against the weight of the evidence. The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. The trial court will award a new trial

---

and incapable of forming consent and was a victim of rape on the same basis as [L.H.].

Appellant's Brief, 44-46 (emphasis in original). This argument goes to the weight, rather than sufficiency of the evidence. *See Commonwealth v. Palo*, 24 A.3d 1050, 1055 (Pa. Super. 2011) (when "[d]irected entirely to the credibility of the Commonwealth's chief witness, [a]ppellant's claim challenges the weight, not the sufficiency of the evidence."). "The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses. . . . An appellate court cannot substitute its judgment for that of the jury on issues of credibility." *Id.* (citations omitted). As further explained, *infra*, the trial court did not abuse its discretion with regard to its ruling on the weight of the evidence.

- 10 -

only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion. Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings.

*Commonwealth v. Cousar*, 928 A.2d 1025, 1035-36 (Pa. 2007).

In its Rule 1925(a) opinion, the trial court explained why it denied

Lampe's challenge to the weight of the evidence as follows:

In the instant case, the jury chose to find the Commonwealth's witnesses credible and decided not to believe [Lampe's] version of events. Based on a review of the evidence, the jury's finding does not "shock one's sense of justice." Even though the defense tried to claim that [Lampe] did not commit the crimes charged, the Commonwealth presented sufficient evidence for the jury to conclude that he did, in fact, commit them. Although there was much more Commonwealth evidence than just her testimony, [] Hughes' testimony alone could have convinced a jury of [Lampe's] guilt. [] Hughes was an unbiased, sober witness who literally walked in on [Lampe] having sex with an unconscious woman. Based on the evidence introduced at trial, the court finds that [Lampe's] claim that the verdict was against the weight of the evidence is without merit.

Trial Court Opinion, 12/16/19, at 11.

Here, all of the witnesses were vigorously challenged and subject to cross-examination on the specific issues Lampe identified above throughout the course of the four-day trial. The jury ultimately believed the combined testimonies of L.H. and Hughes, and resolved the noted inconsistencies. *See Commonwealth v. Palo*, 24 A.3d 1050, 1055 (Pa. Super. 2011) ("The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses.").

After our review of the record, we cannot say that the jury's verdict was so contrary to the evidence, discussed *supra*, as to shock one's sense of justice. *See Cousar*, *supra*. Therefore, the trial court acted within its discretion in denying Lampe's motion for a new trial on the grounds that the verdict was against the weight of the evidence. *Id.*

Next, Lampe challenges the trial court's Rape Shield ruling. Specifically, Lampe points to an interview that Detective Stan Billie of the West Chester Police Department conducted of Tomassini, as an example of the evidence he wishes to introduce.[9] First, Lampe claims that the trial court erred when it excluded evidence of L.H.'s bias and her "ulterior motive to fabricate a claim of rape against [Lampe.]" Appellant's Brief, at 30. Second, Lampe claims that the trial court erred when it "failed to consider whether the probative value of the evidence sought by [] Lampe outweighed the potential for unfair

---

[9] In that interview, the following exchange took place:

> Detective Billie: So prior to all this earlier in the day or earlier in the night, did you make any mention to anybody about Tyler coming over[?] I mean [']hands off[; h]e's mine tonight,['] or something like that?

> [Tomassini]: Yeah. I said it to [L.H.] because she tends to, like, I don't really know how to describe it. She really enjoys sex and she, when she gets drunk, she blacks out like every single time without a doubt. And I had a feeling that if she got drunk and was planning to go out, which she was, she was going to hook up with [Tyler] and make me uncomfortable.

Appellant's Brief, at 26; Transcribed Taped Interview of Allison Tomassini, 5/4/16, at 22-23.

prejudice" because Lampe's proposed evidence "is not inflammatory." Appellant's Brief, at 33.

To the extent that these questions raise Confrontation Clause issues, our standard of review is *de novo* and our scope of review is plenary. **Palmore**, **supra** at 294. Moreover, when subsidiary evidentiary issues are raised, we review the trial court's determination for an abuse of discretion. **Id.**

The Rape Shield Law is governed by section 3104 of the Crimes Code, which states:

> **(a) General rule.—** Evidence of specific instances of the alleged victim's past sexual conduct, past sexual victimization, allegations of past sexual victimization, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions of any offense listed in subsection (c) except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.
>
> **(b) Evidentiary proceedings.—** A defendant who proposes to offer evidence of the alleged victim's past sexual conduct, past sexual victimization, allegations of past sexual victimization, opinion evidence of the alleged victim's past sexual conduct and reputation evidence of the alleged victim's past sexual conduct pursuant to subsection (a) **shall file a written motion and offer of proof at the time of trial.** If, at the time of trial, the court determines that the motion and offer of proof are sufficient on their faces, the court shall order an *in camera* hearing and shall make findings on the record as to the relevance and admissibility of the proposed evidence pursuant to the standards set forth in subsection (a).

18 Pa.C.S.A. §§ 3104(a); (b) (emphasis added). Additionally, we have previously recognized a constitutional exception to this rule for evidence of the victim's bias or motive for fabrication because "the Rape Shield Law may not be used to exclude relevant evidence showing witness bias or attacking a witness' credibility." **Commonwealth v. Palmore**, 195 A.3d 291, 295 (Pa. Super. 2018) (quoting **Commonwealth v. Holder**, 815 A.2d 1115, 1119 n.1 (Pa. Super. 2003)) (brackets omitted).

To satisfy the fabrication exception to the Rape Shield Law,[10] Lampe claims that L.H. had three possible reasons to fabricate the rape claim: (1)

---

[10] We have previously held that not all evidence showing fabrication or bias is admissible. "Pennsylvania's Rape Shield Law may not be used to exclude relevant evidence showing witness' bias or attacking credibility." **Commonwealth v. Black**, 487 A.2d 396, 401 (Pa. Super. 1985) "Although logically relevant, evidence tending to show the victim's prejudice or lack of credibility may be excluded if 'it would so inflame the minds of the jurors that its probative value is outweighed by unfair prejudice.'" **Id.** (citation omitted).

> The trial court must engage in a four-part inquiry if a defendant seeks admission of a victim's past sexual conduct under either the statutory exception or a constitutional exception to the Rape Shield Law. After a defendant provides notice that he or she wishes to introduce such evidence, **see** 18 Pa.C.S.A. § 3104(b), the trial court must determine if the proffered reason for introduction of past sexual conduct evidence is mere speculation or conjecture. If the proffered evidence is not speculation or conjecture, the trial court must conduct an *in camera* hearing. At the conclusion of that hearing
>
> > [t]he trial court must determine (1) if the evidence sought to be admitted is relevant to the accused's defense, (2) whether the evidence sought to be admitted is merely cumulative of evidence otherwise admissible at trial, and (3)

"[L.H.] did not want to get in trouble with her roommate and friend, [Tomassini], who explicitly instructed [L.H.] not to pursue [] Lampe at the start of the night," Appellant's Brief, at 30 n.2; (2) "[L.H.] was upset about being ignored by John Putsch that night and found comfort in [Lampe]," *id.*; and (3) "[L.H.] used the allegation of assault to elicit responses from John Putsch[,] who otherwise ignored her."[11]   *Id.*   Lampe concludes that his proposed evidence is admissible under the exception to the Rape Shield Law for evidence of the victim's bias and fabrication, pursuant to our decisions in *Commonwealth v. Palmore*, 195 A.3d 291 (Pa. Super. 2018), *Commonwealth v. Eck*, 605 A.2d 1248 (Pa. Super. 1992), and *Commonwealth v. Black*, 487 A.2d 396 (Pa. Super. 1985).

Here, the trial court's Rape Shield ruling was made in response to the Commonwealth's motion to exclude, on the second day of trial.[12]   Prior to

---

whether the evidence which the accused wishes to introduce at trial is more probative than prejudicial.

*Commonwealth v. Palmore*, 195 A.3d 291, 295 (Pa. Super. 2018) (some internal citations omitted).

[11] John Putsch, a neighbor living in an apartment adjacent to L.H.'s, had a non-exclusive "physical" relationship with L.H. at the time of the assault.  N.T. Jury Trial, 10/8/18, at 27; N.T. Jury Trial, 10/9/18, at 257.

[12] The Commonwealth explained why it made the motion:

I want to note for the record, the basis for when I asked the [c]ourt to give the instruction you did[] is that the statements I was provided by defense yesterday[,] pursuant to my discovery request, turned over multiple statements wherein they specifically

- 15 -

Myers and Tomassini testifying, the court warned them, under threat of contempt, not to testify regarding their "opinion about the character of another witness." N.T. Jury Trial, 10/9/18, at 145. The court explained, "For example, Ms. Tomassini, you might have an opinion about [']I warned [L.H.] not to sleep with [Lampe] that night because [of] my opinion of [L.H.] or past dealings with [L.H.'] I don't want to hear anything like that. Do you understand that?" *Id.* at 146. Both Myers and Tomassini answered in the affirmative. *Id.* The court concluded, "Because a blurt out like that[] might result in a mistrial, and this case has been waiting for two-and-a-half years. That would not be fair to [] Lampe, and would not be fair to [L.H.] . . . You could possibly go on contempt citations on either one." *Id.*

Lampe's counsel then objected, and restated his position from an earlier sidebar conversation for the record:

> In this case, we have a situation where both [] Hughes and [] Tomassini explicitly say to [L.H.]: ["]Do not hook up with [Lampe].["] Their reasoning for that when I asked the question, not their excuse, [Tomassini's] reasoning for that when I asked the question is ["]I know [L.H.] I know that she would be attracted to [Lampe].["] Now, I don't think that this is barred by [section] 3104 because it says except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible to the rules of evidence.

*Id.* at 147. The court then replied to counsel:

---

> call [L.H.] a whore[,] and they also try to reference particular incidents, which is what led to that request[.]

N.T. Jury Trial, 10/9/18, at 149.

- 16 -

[W]e already have on the record, alleged victim thinks defendant is hot or attractive. Then we have [Tomassini] said stay away from him, basically, and [L.H.] said I will. So I mean we have that in the record that there's a concern from [Tomassini] that [L.H.] might wind up with [Tomassini's], you know, part-time boyfriend or friend with benefits [(Lampe)]. So that's already in the record. My concern is starting to get into anything where you start to venture opinions about the sleeping habits of anybody, whether the defendant or victim, because it's [] character evidence.

*Id.* at 148.

Here, we note that Lampe never filed a written motion and offer of proof in the trial court.[13] **See** 18 Pa.C.S.A. § 3104(b). "A defendant who proposes

_____

[13] In Lampe's reply brief, he argues that he was misled at trial by the Commonwealth:

The procedural posture of the Rape Shield Law issue started on [d]ay 1 of trial when the [d]efense **described on the record a written motion pursuant to 18 Pa.C.S.A. § 3104 it intended to file** to ensure the theory of the defense would be admissible. As the Commonwealth reviewed the [d]efense motion and had no objection, the [d]efense and Commonwealth entered into an agreement as to the admissibility of this evidence.

On the second day of trial, the Commonwealth reneged on that agreement and asked the trial court to make a ruling to preclude that evidence pursuant to Rape Shield Law, and to instruct exculpatory witnesses [] Myers and [] Tomassini outside of the presence of the jury about limitations of their testimony before they testified. The [d]efense objected. The effect of the Commonwealth's reneging, and the trial judge's sanction and implementation of its ruling by admonishing (and intimidating) witnesses [Myers] and [Tomassini], eviscerated their testimony before the jury and denied [] Lampe a fair trial.

Appellant's Reply Brief, at 8-9 (emphasis added; internal citations omitted).

Our review of the record reveals that, on the first day of trial, Lampe's counsel informed the court that "[The Commonwealth attorney] and I have discussed some issues regarding Rape Shield. We're in agreement. We had prepared a

to offer evidence of the alleged victim's past sexual conduct **must file a written motion** and make a specific offer of proof at the time of trial." ***Commonwealth v. Beltz***, 829 A.2d 680, 684 (Pa. Super. 2003) (quoting ***Commonwealth v. Kunkle***, 623 A.2d 336, 339 (Pa. Super. 1993)) (emphasis added). Because Lampe did not file a written motion pursuant to section 3104, but only made an oral objection, we cannot review this claim. ***See also***

motion. We sent it to [the Commonwealth]. [The Commonwealth] doesn't agree with some of the characterization of the testimony, but [] agrees it's not Rape Shield[.]" N.T. *Voir Dire* and Motions, 10/8/18, at 16. The court then asked for clarification whether Lampe's intention was to file a written motion, "You were going to file and you both agreed to that?" ***Id.*** at 17. Lampe's counsel answered in the affirmative. ***Id.***

Here, defense counsel understood the procedure for filing a written motion, apparently had already drafted a written motion at the time of the above on-the-record conversation, and, informed the court that Lampe would file the written motion. Nothing prevented Lampe from filing that written motion. In fact, he was required to do so to preserve his claim. ***See Eck***, ***supra*** at 1254 (citing ***Commonwealth v. Johnson***, 566 A.2d 1197 (Pa. Super. 1989) (en banc) (balancing determination between probative value and unfair prejudice, regarding defendant's proffered evidence of fabrication, is made by trial court at *in camera* hearing similar to that outlined in 18 Pa.C.S.A. 3104(b)); ***see also Palomar***, ***supra*** ("The trial court must engage in a four-part inquiry if a defendant seeks admission of a victim's past sexual conduct under . . . a constitutional exception to the Rape Shield Law. **After a defendant provides notice that he or she wishes to introduce such evidence**, ***see*** 18 Pa.C.S.A. § 3104(b)[,]") (emphasis added). Lampe's claim that the Commonwealth "reneged on th[e] agreement [between the parties as to the admissibility of Lampe's proposed evidence]," ***see*** Appellant's Reply Brief, at 8-9, even if true, is not enough to overcome the requirement that he properly preserve the issue at trial. ***See*** Pa.R.A.P. 302(a) (providing that issues not raised before trial court are waived and may not be raised for first time on appeal); ***see also Commonwealth v. Burns***, 988 A.2d 684, 691 (Pa. Super. 2009) ("The process begins with the defendant submitting a specific proffer [] of exactly what evidence he or she seeks to admit and precisely why it is relevant[.] **This procedure forces the defendant to frame the precise issues and interests involved**[.]")(emphasis added).

*Commonwealth v. Burns*, 988 A.2d 684, 690-91 (Pa. Super. 2009) (failure to make written motion bars review of decision at trial to exclude).

Next, Lampe claims that the trial court erred and "violated due process of law" when it "admonished" Myers and Tomassini, prior to their testifying, as set forth above. Appellant's Brief, at 18. Lampe notes that the trial court never warned any of the other witnesses about their testimony prior to testifying. *Id.* at 20. Lampe concludes that the

> pre-testimonial admonishment of [Tomassini] and [Myers], at the time young college students who had never before been in a courtroom, preemptively tainted their credibility by limiting and chilling their testimony under a guise of improper and unconstitutional [R]ape [S]hield rulings. With a looming threat of contempt, the trial court's actions . . . undercut the truth of [Tomassini's] and [Myers'] testimony, provoked hesitation in their responses before the jury, and allowed the Commonwealth to fashion a false narrative, prompting the jury to discredit their sanitized testimony altogether.

*Id.* at 21.

> Our standard of review is as follows:
>
> When ruling on a trial court's decision to grant or deny a motion *in limine,* we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

*Commonwealth v. Minich*, 4 A.3d 1063, 1068 (Pa. Super. 2010) (internal citations and quotation marks omitted).

Here, the trial court warned Myers and Tomassini not to testify regarding their "opinion about the character of another witness." N.T. Jury Trial,

- 19 -

10/9/18, at 145. This warning was made in response to the Commonwealth's request, which was based on the Commonwealth's representation that there were "multiple statements wherein [Tomassini and Myers] specifically call [L.H.] a whore[,] and they also try to reference particular incidents[.]" *Id.* at 149. The trial court evidently relied on the Rape Shield Law, despite Lampe's failure to file any written motion under section 3104(b).[14]

We have previously discussed the purpose behind the enactment of Pennsylvania's Rape Shield Law:

> Rape shield laws in general are legislative recognitions of the minimal probative value of a complainant's sexual history and are

---

[14] The trial court's Rule 1925(a) opinion addresses this issue, along with several other Rape Shield issues raised by Lampe, collectively, under a single heading. *See* Trial Court Opinion, 12/16/19, at 5-8. The trial court explained its Rape Shield rulings as follows:

> In this case, [Lampe] sought to admit evidence related to [L.H.'s] promiscuity. Specifically, the defense sought to introduce testimony from [] Myers and [] Tomassini that [L.H.] "was the type of girl they did not want [Lampe] engaging with." *See* Appellant's Motion for Judgment of Acquittal, [at] 7. [] Tomassini and [] Myers think [L.H.] "sleeps around" and refer to her as a "whore." N.T. [Jury] 10/9/18, [at] 147-49.
>
> \* \* \*
>
> In this case, the court finds that the testimony [Lampe] wanted to introduce is mere conjecture about "the type of girl" [L.H.] was. This is exactly the type of evidence the Rape Shield Law is intended to preclude. In addition, this type of testimony was clearly more prejudicial than probative. Thus, the court properly applied the Rape Shield Law and ruled that the witnesses were not permitted to testify about [L.H.'s] character in this way.

Trial Court Opinion, 12/16/19, at 6-7.

designed to prohibit the travesty of presenting a noisome stream of defense witnesses testifying to the sexual propensities of the complaining witness. Pennsylvania designed its statute to rectify these abuses. Our Supreme Court has explained that the specific purpose of the Pennsylvania Rape Shield Law is to prevent a sexual assault trial from degenerating into an attack upon the collateral issue of the complainant's reputation rather than focusing on the relevant legal issues and the question of whether the events alleged by the complainant against the defendant actually occurred.

*Commonwealth v. Jones*, 826 A.2d 900, 908 (Pa. Super. 2003) (internal citations and quotation marks omitted).

Here, the trial court was clearly concerned with this exact type of attack on collateral issues. *See Jones*, *supra.* After warning Myers and Tomassini, the trial court stated, "My concern is . . . where you start to venture opinions about the sleeping habits of anybody, whether the defendant or victim, because it's character evidence." N.T. Jury Trial, 10/9/18, at 148. The court concluded:

I have not been party to any of [the references to L.H.'s character just noted by the Commonwealth.] I saw a glimpse of that in prior exhibits in the case. . . . It's a tragic situation all the way around, but **I don't want to open it up to character assassination.** That's the whole point of the Rape Shield Act."

*Id.* at 149 (emphasis added). We find no abuse of discretion under these circumstances. *See Minich*, *supra*. *See also Kunkle*, *supra* at 340 (defendant's oral motion during trial, rather than written motion and specific offer of proof, was inadequate, and there was no abuse of discretion by trial court when it barred evidence pertaining to prior sexual assault of victim).

Next, Lampe claims that the trial court erred in instructing the jury that intoxication is not a defense. Lampe points out that "intoxication was never raised as a defense, and, as it is not a jury charge available for offenses aside from first[-]degree murder, the trial court improperly included, at the Commonwealth's request, 'Voluntary Intoxication or Drugged Condition No Defense' as an instruction in this case." Appellant's Brief, at 53. Lampe argues that the instruction "erroneously misled the jury into believing [] Lampe was not allowed to be intoxicated but [L.H.] was, and this error fed the Commonwealth's theory that intoxication caused [] Lampe to act out of character by raping another person." *Id.*

Our standard of review for a challenge to a trial court's jury charge is well-settled:

> When evaluating jury instructions, the charge must be read as a whole to determine whether it was fair or prejudicial. The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration.

*Commonwealth v. Stokes*, 615 A.2d 704, 708 (Pa. 1992) (quoting *Commonwealth v. Prosdocimo*, 578 A.2d 1273, 1274 (Pa. 1990)).

We have previously reviewed a similar situation where the trial court instructed the jury that voluntary intoxication is not a defense to a crime other than first-degree murder. In *Commonwealth v. Graham*, 576 A.2d 371 (Pa. Super. 1990), the trial court instructed the jury that voluntary intoxication was not a defense to aggravated assault. *Id.* at 375. In that case, we found no abuse of discretion because the appellant conceded he drank a large

- 22 -

quantity of alcohol, the prosecution made an issue of his intoxication during cross-examination, and the jury asked a question about the definition of intent. ***Id.***

Here, Lampe concedes that he drank so much alcohol that he does not remember what happened. ***See*** Appellant's Brief, at 45-46. In addition, the prosecution made an issue of Lampe's intoxication through the cross-examination of Lampe's expert witness on alcohol-induced blackouts, Dr. Elliot Atkins. ***See*** N.T. Jury Trial, 10/11/18, at 82-85. Moreover, though not raised as a defense, one of Lampe's theories of the case is that he had drunken, consensual sex with L.H. ***See*** N.T. Jury Trial, 10/11/18, at 153 (in closing argument, Lampe's trial counsel stated to the jury "so if [Tomassini] hears the sounds of people having sex, and if she hears [L.H.] moaning in a pleasurable way, and if [Myers] hears [L.H.] say ['Y]es Tyler,['] then [L.H.] was not unconscious.") We discern no abuse of discretion under these circumstances. ***See Stokes***, ***supra***. ***See also Graham***, ***supra*** at 375 (trial court has power to decide whether additional information not requested by jury is necessary to assist jury in understanding issue involved).

Next, Lampe claims the trial court erred by failing to instruct the jury that it could adjourn for the evening before rendering a verdict. Lampe argues that this led to a rushed and coerced verdict, which was rendered at 10:30 p.m. ***See*** Appellant's Brief, at 57. Lampe also claims that "[t]he week after trial, [j]uror #9 came into contact with [d]efense [c]ounsel through her husband and relayed to [d]efense [c]ounsel that she and the other jurors were

- 23 -

unaware they could go home that evening without first rendering a verdict." Appellant's Brief, at 57. In further support of his claim, Lampe states that "the jury instructions left little room for interpretation. The jury was to eat dinner and schedule[d] to stay the night. . . . Alternate jurors were told they had the ability to watch the Eagles game that night as the others deliberated." *Id.* (internal citations omitted).

Here, the Commonwealth argues that Lampe failed to preserve this issue since he did not object when given the chance to do so. We agree. Specifically, at trial, while the jury was present, the court stated its "game plan" for the final stages of the trial:

> THE COURT: Okay, everybody have a seat. Thank you, ladies and gentlemen. I always like to clue you in on what's going on. This is the **game plan.** We're going to be ready to do closings and charge and give you the case to deliberate. We will do that. We will have the closings at three o'clock. First, defense, then the Commonwealth. I will take a break. Then give you the jury charge. What I want you to do is because you have been patient, between now and [] three, we will give you menus from Carlino's so that you can order dinner so we can actually have a minute. When I finish, you will have food sitting there so you have a clear head and you can start deliberating. **Okay, is that okay with everybody, with that schedule to stay tonight? Anybody have a problem with that[?] So, that's the game plan**. We can get the case to you today. The attorneys have been working diligently to move the case along. I will give you a little time to get your thoughts together for what they want to do by three. You can order now. At three, we will start the closings; okay. Thank you, see you then. Again, keep an open mind. You have not heard all the evidence.

N.T. Jury Trial, 10/11/18, at 136 (emphasis added). Lampe argues that he preserved this issue at trial, as evidenced at the post-verdict motion hearing when the following on-the-record conversation took place:

[Lampe's Attorney]: I want to make sure the record is complete. The [c]ourt gave us the opportunity Thursday afternoon to decide whether we wanted to close on Thursday afternoon or come back Friday and close. We agreed to close. I then requested that the [c]ourt close, that you charge the jury and then send them home and bring them back the next morning to begin deliberations.

THE COURT: Frankly, I don't recall that part. I said no I would rather have them—

[Lampe's Attorney]: You said: [`]No, I'm not doing that.[']

THE COURT: Okay, I'm glad you cleared up the record; fine.

N.T. Post-Verdict Motions Hearing, 12/5/18, at 28.

"[I]t is well established that absent a contemporaneous objection, the issue is not properly preserved on appeal." *Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1287 (Pa. Super. 2004); *see* Pa.R.A.P. 302(a) (providing that issues not raised before trial court are waived and may not be raised for first time on appeal).

Only issues that are properly raised and preserved in the trial court may be considered on appeal. Pa.R.A.P. 302(a). Issues raised before or during trial are properly preserved for appeal. Pa.R.Crim.P. 720(B)(1)(c). So are issues raised in a timely optional post-sentence motion, **provided those issues were properly preserved at the appropriate point in the proceedings**. Pa.R.Crim.P. 720(B). **For example, a criminal defendant could not assert a claim in a post-sentence motion for a new trial** that evidence was erroneously admitted during his trial **if he hadn't lodged an objection during the trial** when the evidence was admitted. Failure to object results in a waiver of the claim.

- 25 -

*Id.* at 1288-89 (quoting ***Commonwealth v. Kohan***, 825 A.2d 702, 705-06 (Pa. Super. 2003)) (emphasis added).

Here, the court offered its "game plan" and then gave Lampe an opportunity to object. ***See*** N.T. Jury Trial, 10/11/18, at 136. Lampe did not object contemporaneously. ***See Melendez-Rodriguez***, ***supra***. Instead, he waited until the post-sentence motion hearing, which was conducted several weeks later, to attempt to amend the record and insert an objection. ***See*** N.T. Post-Verdict Motions Hearing, 12/5/18, at 28. Because this issue was not properly preserved at trial via contemporaneous objection, we cannot review this claim. ***See Melendez-Rodriguez***, ***supra***.

Finally, Lampe claims that the trial court erred when it denied his motion for a new trial based on evidence of juror misconduct. In the alternative, Lampe claims that the evidence of juror misconduct entitles him to a hearing to develop and explore the claim further. Specifically, Lampe points to a letter that juror #15 wrote to the court after the trial. In his letter to the court, juror #15 identified statements made by other jurors in the courthouse hallways prior to deliberations—though he did not know exactly who made the statements, or who heard them—including, "Why didn't they let [Lampe] take the stand?" and "In today's day and age, like it or not, guys are guilty first." Appellant's Brief, at 58. Lampe further argues that

> [t]he reported comments reveal an outside influence improperly bearing on at least one member of the jury. This trial occurred the week following the United States Senate broadcasted hearing involving testimony of [Dr.] Christine Blasey Ford and then-nominee Supreme Court Justice Brett Kavanaugh. The tension

- 26 -

from this event in the midst of the #metoo and #TimesUp! movement was palpable throughout trial, which concern was repeatedly RAISED by the [d]efense.

*Id.* at 59 (emphasis in original).

We review Lampe's motion for a new trial under the following standard:

The decision to grant or deny a motion for mistrial is within the sound discretion of the trial court and will not be reversed absent a flagrant abuse of that discretion. A mistrial is required only when an incident is of such nature that its unavoidable effect is to deprive the defendant of a fair trial. A mistrial is not warranted when the event at trial which is alleged to have caused the prejudice to the defendant is of a speculative nature.

*Commonwealth v. La*, 640 A.2d 1336, 1347 (Pa. Super. 1994) (internal citations omitted).

Here, during the jury charge, the court properly instructed the jury to consider only the evidence admitted at trial. *See* N.T. Jury Trial, 10/11/18, at 188 ("In determining the facts, you must consider only the evidence that has been presented to you in the courtroom and the logical inferences that can be drawn from that evidence. You are not to guess, speculate or rely on matters that are not in evidence."). Nothing related to the Supreme Court confirmation hearings for then-nominee Brett Kavanaugh was admitted into evidence. Similarly, all of the issues raised by juror #15 were matters not in evidence. *See* Letter from J. A. "Jay" Janson, 10/11/18, at 1-4 (raising concern regarding: (1) comments made by jurors in hallway, though he does not know who made them; (2) his subjective perception that deliberations should have lasted longer; (3) his observations of jurors crying upon reading the verdict; (4) his perception that the defense was not allowed to adequately

probe the true meaning behind a text message; (5) his perception that photos introduced by the Commonwealth at trial were misleading; (6) his independent research that "the moon that night was a waxing gibbous (~69%) and set at 03:33—meaning it would have been a very dark sky even a few hours prior to the alleged incident corroborating everyone's testimony in the room that it was 'very dark'"; (7) his perception of various inconsistencies in the evidence; and (8) his independent research of Hughes' and Tomassini's social media accounts). Any possible improper reliance by the jurors on matters not in evidence was cured by the court's jury charge. *See Commonwealth v. Williams*, 381 A.2d 1285, 1291 (Pa. Super. 1977) (reversible error can be cured by trial court's prompt and adequate cautionary instruction). Moreover, jurors are presumed to follow the court's instructions. *See also Commonwealth v. Baker*, 614 A.2d 663, 672 (Pa. 1992) ("The presumption in our law is that the jury has followed instructions."). Therefore, the trial court did not abuse its discretion in declining to grant a new trial. *See La*, *supra*.

Lampe claims that he is entitled to a hearing to further explore this alleged juror error. We disagree. A juror's competency to testify as a witness regarding the validity of a verdict is governed by Pa.R.E. 606, which states:

> Upon an inquiry into the validity of a verdict, . . . a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions in reaching a decision upon the verdict or concerning the juror's mental processes in connection therewith, and a juror's affidavit or evidence of any statement by the juror about any of these subjects may not be

received. However, a juror may testify concerning whether prejudicial facts not of record, and beyond common knowledge and experience, were improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

*Commonwealth v. Steele*, 961 A.2d 786, 808 (Pa. 2008); Pa.R.E. 606(b).

Our Supreme Court went on to explain Rule 606's applicability:

This rule is often referred to as the "no impeachment rule." We recognized in *Carter* [*v. U.S. Steel Corp*. **604 A.2 1010 (Pa. 1992)**] that the strict "no impeachment" rule provides a narrow exception for "post[-]trial testimony of extraneous influences which might have affected [or prejudiced] the jury during deliberations." Under this exception, pursuant to *Carter*, the juror may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations. Under no circumstances may jurors testify regarding their subjective reasoning processes.

. . . The exception only applies to <u>outside</u> influences, not statements made by the jurors themselves.

*Steele*, *supra* at 808 (emphasis and brackets around "or prejudiced" in original).

Here, Lampe relies upon juror #15's letter to the court detailing that juror's concerns with the verdict, and juror #9's statement to defense counsel that she and other jurors were unaware they could go home without first rendering a verdict. **See** Appellant's Brief, at 58-60. Notably, juror #15 was an alternate juror, and was not present in the deliberation room during jury deliberations. In fact, much of the juror's letter, and Lampe's argument, focuses on the alleged statements made by the jurors themselves, which testimony is not eligible for the **Carter** exception to the "no impeachment rule." **See Steele**, **supra**. Moreover, juror #9's proposed testimony is not

limited to outside influences, *see id.*, as that juror proposed to testify that she and the other jurors were "unaware they could go home that evening without first rendering a verdict." Appellant's Brief, at 57. This testimony clearly delves into the jury's deliberations, the other jurors' minds or emotions in reaching their decision upon the verdict, and the jurors' mental processes in connection with the deliberations. *See Steele*, *supra*. No such testimony is permitted; therefore, the court did not abuse its discretion in declining to grant a hearing to explore this issue further. *See id.*; *see also* Pa.R.E. 606(b).

Judgment of sentence affirmed.

Judge Strassburger joins this Memorandum.

Judge King did not participate in the consideration or decision of this matter.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/22/20