J-A07016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
:
JOSEPH AGUAYO-QUINONES :
:
Appellant : No. 858 MDA 2023

Appeal from the Judgment of Sentence Entered May 17, 2023
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0002060-2021

BEFORE: STABILE, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SULLIVAN, J.: **FILED MAY 07, 2025**

Joseph Aguayo-Quinones ("Aguayo-Quinones") appeals from his

judgment of sentence following his conviction by jury for first-degree murder.[1]

Following our careful review, we affirm.

The trial court set forth the subsequent factual and procedural history

as follows:

Shortly after 11:00 p.m. on the evening of March 16, 2021,
police responded to a report of a man down in the area of 13th
and Kittatinny Streets in the City of Harrisburg. Upon arrival to
the area, police found [Salvatore Gianquitto ("the Victim")] lying
on the ground on Buckthorn Street. [The] Victim, who had been
stabbed once in the upper-left chest, sustained a 7.1-inch x 0.5-
inch wound that had penetrated 4.25 inches deep into his chest
and through his heart and lung. Other than the stab wound to the
chest, [the] Victim sustained no other injuries except for an
abrasion to his top knee area that appeared to have been caused

_____

[*] Former Justice specially assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. § 2502(a).

by him falling to the ground. EMS personnel pronounced [the] Victim dead at the scene. Shortly after police arrived on the scene of the Victim's stabbing, some officers were diverted to USA Fried Chicken at the corner of 13th and Derry Streets for a report of a man inside the store who had been shot. Upon arrival at USA Fried Chicken, officers encountered [Aguayo-Quinones], who store employees had moved to a back area behind the kitchen.

Police were able to recover video footage of the stabbing incident from home surveillance cameras that were located at 1317 Kittatinny Street and 1324 Kittatinny Street. Video footage from these cameras showed that after [Aguayo-Quinones] walked around in the vicinity for at least several minutes before the incident occurred, [Aguayo-Quinones] walked past several other individuals on Kittatinny Street; approached [the] Victim, who was standing stationary; and stabbed [the] Victim. [Aguayo-Quinones], who was wearing a mask and a backpack, then began to run away westbound on Kittatinny Street. [The] Victim initially began to follow [Aguayo-Quinones] up Kittatinny Street, but [the] Victim then turned around and stood behind a man named Kevin Tarr [("Tarr")], who it appeared was firing a gun towards the running [Aguayo-Quinones]. [The] Victim and Tarr then turned and began to run up Buckthorn Street, where [the] Victim ultimately fell to the ground and where police ultimately found him. In the meantime, [Aguayo-Quinones] continued to run down Kittatinny Street and then onto 13th Street, and he eventually ended up at USA Fried Chicken at the comer of 13th and Derry Streets. Investigating officers later discovered [Aguayo-Quinones]'s backpack and a long-handled bloody kitchen knife across from 235 South 13th Street, which was located along [Aguayo-Quinones]'s flight path from Kittatinny Street to USA Fried Chicken. Forensic testing established that the blood on the blade of the knife belonged to Victim.

In the aftermath of the stabbing, the police interviewed [Aguayo-Quinones] three separate times[, each of which will be discussed in further detail *infra*.]

\* \* \* \*

[Notably, however, o]n March 19, 2021, three days after the stabbing, [and two days after police took Aguayo-Quinones into custody,] at the request of [Aguayo-Quinones], he sat down with Detective Licata for a third police interview. During that interview,

[Detective Licata informed Aguayo-Quinones of his right to remain silent pursuant to **Miranda v. Arizona**, 384 U.S. 436 (1966), after which Aguayo-Quinones consented to speak to him and] finally admitted to stabbing the Victim, but he claimed that he did so in self[-]defense because the Victim had a knife.

* * * *

As he had done during his third police interview on March 19, 2021, [Aguayo-Quinones] claimed self-defense throughout the course of his trial testimony. [Aguayo-Quinones] testified that on the night of the incident, approximately 20 or 30 minutes before the stabbing, he was walking down the street towards the location of the incident with some friends when [the] Victim came towards him with two or three other people. [The] Victim and [Aguayo-Quinones] exchanged some words, and according to [Aguayo-Quinones], [the] Victim pulled out a knife and threatened [Aguayo-Quinones]. [Aguayo-Quinones] stated that he became frightened and left the area through an alley to retrieve the kitchen knife from a friend. He stated that he then returned to the same area where the altercation initially occurred and started walking around because he was afraid to go into an abandoned house and did not think there was anywhere else he could go. Eventually, about 20 or 30 minutes later, as he was walking through an alley and onto Kittatinny Street, he encountered [the] Victim again. According to [Aguayo-Quinones], [the] Victim put his hands into his pocket, to which [Aguayo-Quinones] responded by "throwing" the [k]itchen knife at [the] Victim. [Aguayo-Quinones] then began running down Kittatinny Street, and . . . Tarr, who was [the] Victim's friend[], shot at [Aguayo-Quinones] as he was running. At one point, while running, [Aguayo-Quinones] fell to the ground and dropped his knife and backpack but then got up and continued running until he reached USA Fried Chicken. Once he reached USA Fried Chicken, he told employees to call the police because shots had been fired at him.

Trial Ct. Op., 9/18/23, at 2-5 (citations to the record omitted).

As noted above, police interviewed Aguayo-Quinones three times, each of which was recorded, and portions of each were played before the jury at trial.

The trial court describes the first interview as follows:

> . . . During his first interview, which occurred on the night of the stabbing, [Aguayo-Quinones] stated that he was merely a bystander across the street during the stabbing, that someone else stabbed [the] Victim, and that the perpetrator was a young boy with a blue shirt and curly hair. [Aguayo-Quinones] told police that after this young boy stabbed [the] Victim, the same young boy then shot at [Aguayo-Quinones]. [Aguayo-Quinones] would later admit that the statements he made in his first interview were false and that the young boy he described did not in fact exist. [Aguayo-Quinones] claimed that he lied in his first interview because he was afraid of "having more problems than the ones [he] already had at that time." [The police treated Aguayo-Quinones as a witness during the first interview.]

Trial Ct. Op., 9/18/23, at 3. As stated above, portions of the video from the first interview were played for the jury. *See* N.T., 5/8-10/23, at 207-09.

On March 17, 2021, police took Aguayo-Quinones into custody, *see id*. at 194, after which Detective Licata conducted a second interview with him, which was video-recorded, and portions of which were played for the jury.[2] *See id*. at 211. The trial court describes the second interview as follows:

> In a second interview with police, which occurred the day after the stabbing, Detective Nicholas Licata [("Detective Licata")], the affiant in this matter, informed [Aguayo-Quinones] that police had retrieved video footage of the stabbing incident. Initially, despite being told about the video, [Aguayo-Quinones] maintained that he was not the person who stabbed the Victim. However, when Detective Licata informed [Aguayo-Quinones] that the video showed [Aguayo-Quinones] perpetrating the stabbing, [Aguayo-Quinones] exclaimed, "Oh, man." After that, [Aguayo-

---

[2] The record is not clear if or when Aguayo-Quinones was *Mirandized* during the second interview on the day of his arrest; however this Court assumes *Miranda* was executed given the detective's statement in the third interview alluding to Aguayo-Quinones's request for an attorney during that previous interview.

Quinones] would not answer any of the officers' questions, continuously stating that "no one is there to help [him]."

Trial Ct. Op., 9/18/23, at 3-4.[3]

Aguayo-Quinones requested a third interview with Detective Licata. Initially, he asked to give a statement to Detective Licata, and thereafter Detective Licata read him his **_Miranda_** rights. **_See id_**. at 215. For the third interview, Detective Licata used a portable digital recorder to take Aguayo-Quinones's statement at the Dauphin County Prison. **_See_** N.T., 5/8-10/23, at 215-16. In this third interview, as discussed above, Aguayo-Quinones admitted to stabbing the Victim, but asserted it was self-defense because the Victim had a knife. **_See_** Trial Ct. Op., 9/18/23, at 4. It appears from the record that the audio recording of the third interview was played for the jury

---

[3] Our review of the notes of testimony reveals that the Commonwealth played excerpts from the second interview including from timestamp 2958 to 4658. **_See_** N.T., 5/8-10/23, at 213. Aguayo-Quinones, at approximately 3810, indicates he did not want to speak further about his "situation" until he obtained a lawyer; however, he continued to volunteer statements to Detective Licata for several minutes. This portion of the interview appears to have been played without objection from Aguayo-Quinones. **_See id_**. However, during argument at trial on Aguayo-Quinones's mistrial motion following admission of the third interview, the Commonwealth asserted that "the jury didn't even see that invocation [of an attorney] request." **_See id_**. at 233. Additionally, there was a transcript of the interview handed out to the jury, but not admitted into evidence, in which it appears that Aguayo-Quinones's statement about desiring counsel is redacted. **_See id_**. at 212, 232. In sum, it is unclear from the record whether the jury heard Aguayo-Quinones's actual invocation of his right to remain silent and request for an attorney.

in its entirety,[4] without objection from Aguayo-Quinones's attorneys. The interview recording lasted a little over twenty-one minutes. *See* N.T., 5/8-10/23, Commonwealth's Ex. 62. In the twenty-one-minute recording, there was a brief statement by the detective, lasting approximately eight seconds, alluding to the fact that Aguayo-Quinones had invoked his right to remain silent in the second interview. One of two Aguayo-Quinones's defense counsel moved for a mistrial afterward. The Commonwealth asserted during argument on the motion that the other defense attorney had consented to the admission of the recording. Neither defense attorney expressly addressed the Commonwealth's representation that a defense attorney had consented to the recording in its entirety prior to it being played for the jury. The trial court did not make a finding of fact about whether there was consent, and, if so, whether that constituted waiver of the issue. However, the trial court denied the mistrial motion. Defense counsel did not seek, nor did the trial court offer, a curative instruction. *See id*. at 231-33.

At the conclusion of the trial, the jury found Aguayo-Quinones guilty of first-degree murder and the trial court sentenced him to life in prison without the possibility of parole. Aguayo-Quinones appealed, and both he and the trial court complied with Pa.R.A.P. 1925.

_____

[4] Although not entirely clear, it is implied in the record that the whole audio recording of the third interview was played. *See*, *e.g.*, N.T., 5/8-10/23, at 215-16.

Aguayo-Quinones raises the following issue for our review:

Whether the trial court erred in not granting defense's request for a mistrial when the prosecution's recording referred to [] Aguayo-Quinones's post-arrest silence, the trial court provided no curative instruction, and the case was based on whether [] Aguayo-Quinones acted with justification in slaying the decedent?

Aguayo-Quinones's Brief at 21.

Our standard of review of a court's denial of a motion for mistrial is as follows:

A motion for a mistrial is within the discretion of the trial court. A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. On appeal, our standard of review is whether the trial court abused that discretion.

**Commonwealth v. Bennett**, 225 A.3d 883, 890 (Pa. Super. 2019) (internal citation omitted). An abuse of discretion "is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will . . .." **Commonwealth v. Brooker**, 103 A.3d 325, 332 (Pa. Super. 2014) (internal citation omitted).

In his sole appellate issue, Aguayo-Quinones argues the trial court abused its discretion in denying his motion for a mistrial following admission of **the third interview**, *i.e.*, an audio recording containing an inadvertent reference to his prior invocation of his right to remain silent pursuant to **Miranda**. Our Supreme Court has recently set forth the law as follows: Pre-

- 7 -

arrest silence and post-arrest silence are to be distinguished, and case law addressing pre-arrest silence is not to be applied to issues of post-arrest silence. *See Commonwealth v. Rivera*, 296 A.3d 1141, 1152 (Pa. 2023). The Court has previously instructed that "[a]n accused's Fifth Amendment right to remain silent after arrest is unequivocal. Any mention of the fact that a defendant availed himself of that protection must be scrupulously avoided." *Commonwealth v. Williams*, 442 A.2d 314, 316 (Pa. 1982). Indeed, "testimonial reference to a defendant's post-arrest silence is constitutionally off-limits; even a single reference, as reflected, risks reducing to rubble an entire prosecution." *Rivera*, 296 A.3d at 1157. Our Supreme Court has explained that the policy underlying this prohibition is as follows:

> For now, it seems sufficient to say, as this Court repeatedly has, that most jurors, most lay people, probably suppose that a truly innocent man would deny the charges upon his arrest. Hearing a defendant did not so deny, but instead stayed silent, the logic goes, may lead the jury to conclude or infer the defendant must be guilty. The problem with this, as this Court has historically viewed it, is that it effectively penalizes a defendant for exercising a right that the drafters of the Pennsylvania and United States Constitutions alike deemed worthy of enshrinement. In total then, while the law concerning pre-arrest silence may be in some flux, we reaffirm the penalty rationale, as developed by the common law, as a sound (though not exclusive) basis to explain why references to post-arrest silence are proscribed.

*Id*. at 1153 (internal citations, quotations, and footnote omitted).

Accordingly, "referencing a defendant's post-arrest silence may imperil an entire case. In fact, . . . we have often deemed a single such reference— answered or not, curative instruction or not—offensive enough to the

constitution and the principles it embodies as to call for a new trial." ***Id***. at 1154. That said, while reference to an accused's post-arrest silence may be reversible error, it is still subject to a harmless error analysis:

> [H]armless error exists [if] . . . (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

***Id***. at 1146 (internal citations omitted; brackets in original).

Generally, the first prong of the harmless error test will not apply where there is a violation of the defendant's right to silence. ***See id***. at 1159 ("We do, however, agree . . . that the phrase '*de minimis*' should not be used; at least for purposes of the . . . harmless error test and in situations where, as here, a defendant does not testify that he spoke to police after he was arrested," and concluding the "first prong [is] out"). Where the third prong is invoked, the Commonwealth must prove beyond a reasonable doubt that the properly admitted and uncontradicted evidence of guilt was overwhelming and the prejudicial effect of the error so insignificant by comparison that it could not have contributed to the verdict). ***See id***.

Regarding the denial of his mistrial motion following a reference in the ***third interview*** to his post-arrest silence, Aguayo-Quinones argues that "references to post-arrest silence are *per se* errors, even in a minor statement." Aguayo-Quinones's Brief at 20. He argues that the trial court

denied his mistrial motion and did not provide a curative instruction. *See id*. at 21. He asserts that it is "irrelevant that the Commonwealth did not seek out these comments, as the post-arrest case law makes clear that any reference, even minor, is treacherous for the Commonwealth." *Id*. Aguayo-Quinones further maintains that this error was not harmless because it impacted his credibility insofar as he took the stand to establish a self-defense, or imperfect self-defense, theory of the case. *See id*. at 22. Aguayo-Quinones asserts he was so nearsighted he could not see individuals far away. *See id*. Because of his poor eyesight, "he was unable to see [the victim] until he was right in front of him[, and, consequently,] believed the encounter would escalate into violence, necessitating his reaction[, *i.e.*, stabbing the victim]." *Id*. at 23. According to Aguayo-Quinones, for the jurors, "there will always remain the doubt [about] whether his initial reluctance to speak with police was an attempt to avoid speaking about the incident or was a delay tactic to pick a story." *Id*. at 29.

The trial court considered Aguayo-Quinones's issue and concluded it merited no relief because the interview containing the reference to Aguayo-Quinones's silence was not introduced for the purpose of suggesting to the jury an adverse inference from his prior invocation of his right to counsel; rather, it "indicated [he] was now waiving his right to remain silent and that he was now willing to sit down and speak about the incident, although his statements about the [V]ictim's stabbing differed vastly from the statements

he had made to authorities in prior interviews[,]" and, thus, "to the extent the Commonwealth introduced the recording as evidence of [Aguayo-Quinones's] guilt, it was not to infer his guilt from a desire to remain silent or have an attorney." Trial Ct. Op., 9/18/23, at 6-7.

The trial court additionally reasoned that, even if the reference to Aguayo-Quinones's post-arrest silence were error, it was harmless because of the overwhelming evidence of Aguayo-Quinones's guilt:

> . . . However, even assuming *arguendo* that playing the recording was inappropriate, the error was harmless due to the overwhelming evidence of defendant's guilt, as established by the remaining evidence presented to the jury.
>
> * * * *
>
> We maintain that . . . the instant matter was not a close case. The evidence presented to the jury, much of it consisting of video footage, established that [Aguayo-Quinones] and [the] Victim were involved in an altercation about 20 or 30 minutes before the stabbing. [Aguayo-Quinones] then went to retrieve a knife, and despite claiming to be afraid of the Victim, [Aguayo-Quinones] loitered in [the] Victim's known hangout area for nearly 30 minutes before ultimately approaching [the] Victim and brutally stabbing him in the chest. [Aguayo-Quinones] then ran away from the scene, leaving [the] Victim to die, and dropping the bloody murder weapon in his path of flight. Following the incident, [Aguayo-Quinones] provided statements to the police three separate times, admittedly telling them complete lies during his initial statements, and only admitting his involvement in the stabbing and crafting a narrative of self-defense during his third interview after he had been presented with irrefutable video evidence that he had been the individual who stabbed [the] Victim. Therefore, the trial in the instant matter clearly consisted of an overwhelming river of evidence against [Aguayo-Quinones], and its flow was unaffected by Detective Licata's brief reference to [his] previous request for counsel.

Trial Ct. Op., 9/18/23, at 8-9.

- 11 -

We decline to disturb the trial court's ruling.[5]  As an initial matter, we conclude that the reference to Aguayo-Quinones's post-arrest invocation of his right to silence was error.  **See Williams**, 442 A.2d at 316 (providing that the right to silence is unequivocal and reference to it at trial is to be scrupulously avoided).  However, the analysis does not end there, because **Rivera** allows for a harmless error analysis where a defendant's right to silence is violated.

Based on our review, we conclude the record supports the trial court's determination that the evidence against Aguayo-Quinones was so overwhelming so as to make the prejudice from the reference to his post-

---

[5] Instead of arguing that Aguayo-Quinones's right to silence was not violated, the Commonwealth rests first on waiver and, failing that, harmless error.  We decline the Commonwealth's waiver invitation.  The Commonwealth argues that one of Aguayo-Quinones's attorneys consented to the playing of the interview knowing that it referenced Aguayo-Quinones's assertion of his right to silence.  **See id**. at 8.  Our review of the record reveals some confusion and disagreement between the parties about the scope of defense counsel's consent to the admission of this exhibit.  **See** N.T., 5/8-10/23, at 215-17, 231-33.  Additionally, the trial court did not make any credibility determinations or findings of fact about the scope of the parties' agreement regarding this exhibit; nor did the trial court find at trial, or subsequently in its Rule 1925(a) opinion, that Aguayo-Quinones had waived this issue.  Additionally, as noted in n.2 **supra**, it is unclear whether the jury heard Aguayo-Quinones's actual invocation of his right to remain silent.  Under these circumstances, we do not find waiver.

arrest silence insignificant by comparison.[6]  The properly admitted evidence

at trial included the following:

- After an argument with the Victim, Aguayo-Quinones retrieved a knife, and "repeatedly walked to a location where [he] knew [the Victim was] known to hang out," and brought the knife with him to the Victim's location.  N.T., 5/8-10/23, at 291-92.  As Aguayo-Quinones described it, "After he came to me the first time, then I went to him the second time . . .."  *Id*. at 309.  Video evidence shows Aguayo-Quinones approaching a group that includes the Victim, and then approaching the Victim and stabbing him within approximately five seconds, and then sprinting away.  *See id*., Commonwealth's Exhibit 5, at 0:35 – 0:51.

- The uncontroverted evidence at trial showed that Aguayo-Quinones stabbed the Victim in the heart and lung.  *See* N.T., 5/8-10/23, at Commonwealth's Exhibit 59, p. 5; *see also id*. at 169 (testimony by coroner that the knife penetrated "deep inside [the Victim's] chest through the heart and the lung); *id*. at 171.  Aguayo-Quinones stabbed the Victim with enough force to break one of his ribs.  *See id*. at 175.

- There was an absence of defensive wounds on the Victim's hands, which is notable because, had there been a knife fight between Aguayo-Quinones and the Victim, one would expect to see defensive wounds.  *See id*. at 170, 173-74.

- Aguayo-Quinones provided several inconsistent versions of the incident.  Initially, he lied and told police that a young boy with a blue sweatshirt and curly hair stabbed the Victim, and that he, Aguayo-Quinones, was across the street at the time, *see id*. at 283; but when informed during his second police interview that there was video footage of him stabbing the Victim, Aguayo-Quinones  responded, "Oh, man," *id*. at 284; only in his third interview, did Aguayo-Quinones assert self-defense and claim that the victim had a knife and was the aggressor, *see id*. at 286-87.  Prior to trial, Aguayo-Quinones had never publicly identified the

---

[6] We note that neither the trial court nor the Commonwealth assert that the error was harmless because the prejudice was *de minimis* or because it was cumulative of properly admitted evidence.  *Cf*. *Rivera*, 296 A.3d at 1159 (holding that a violation of a defendant's right to silence is never *de minimis* and that the cumulative argument is unavailable where not pursued by the Commonwealth).

color of the knife he claimed the Victim brandished. ***See id***. at 288-89.[7] Additionally, Aguayo-Quinones testified he only began running, following the stabbing, after Tarr shot at him. ***See id***. at 294. However, his testimony was inconsistent with the video evidence, which showed that he ran away before Tarr shot at him. ***See id***. at 294-95; ***see also id***., Commonwealth's Exhibit 5, at 0:44 – 0:52.

- The video at trial depicted the stabbing. ***See id***., Commonwealth's Exhibit 5, at 00:35 – 0:51.

Thus, we cannot say that a fleeting reference in the recorded interview to Aguayo-Quinones's prior invocation of his right to silence,[8] just before waiving that same right, was so prejudicial as to deny him a fair trial, given the overwhelming evidence of his guilt, including: the video of the stabbing; the fact that Aguayo-Quinones used a deadly weapon on a vital part of the

---

[7] ***Cf***. N.T., 5/8-10/23, at 277, 288-89 (Aguayo-Quinones testifying the victim drew an orange knife on him which provoked the knife attack, but conceding he only asserted the color of the knife for the first time at trial, though he "always told [his] lawyer"). The black/orange knife was found following the homicide folded up. ***See id***. at 127. The DNA on the blade of the orange knife was too complex of a mixture to give usable results, while there was insufficient DNA on the blade of that knife. ***See id***. at 152. The victim's blood matched the blood on the kitchen knife Aguayo-Quinones used to stab him. ***See id***. The DNA on the handle of the kitchen knife was inconclusive. ***See id***. at 151-52. There is no dispute that Aguayo-Quinones used the kitchen knife to stab the victim. ***See***, ***e.g.***, ***id***. at 308.

[8] Our review of the audio recording reveals that the verbatim reference is as follows: "We spoke the other day about an incident that happened a couple of days ago. The other day, we had stopped talking because you requested an attorney. Okay, so I'm reminding you right now, you know, that you have the right to an attorney before, during, and after questioning . . .." N.T., 5/8-10/23, Commonwealth's Ex. 62 at 0:21 – 0:36. The sentence in which Detective Licata referenced Aguayo-Quinones's prior invocation of his right to silence lasted approximately eight seconds.

Victim's body, namely, his heart, with enough force to break a rib bone; the antecedent circumstances showing that a confrontation between Aguayo-Quinones and the Victim occurred approximately a half hour before Aguayo-Quinones returned, several times, to a location where he knew the Victim would be, before stabbing him; and Aguayo-Quinones's several lies and inconsistent statements prior to, and during his testimony at, trial. ***See Commonwealth v. Faurelus***, 147 A.3d 905, 912 (Pa. Super. 2016) (a defendant's use of a deadly weapon on a vital part of the victim's body permits the fact-finder to infer malice and specific intent to kill); ***Commonwealth v. Jones***, 271 A.3d 452, 460 (Pa. Super. 2021) (holding that evidence that a defendant was able to retreat "with complete safety," but nevertheless returned to the scene of a confrontation, which resulted in a homicide, is evidence negating self-defense and imperfect self-defense); 18 Pa.C.S.A. § 505(b)(2)(ii).[9]

For the foregoing reasons, we conclude the error was harmless based on the overwhelming evidence of Aguayo-Quinones's guilt, and, accordingly, Aguayo-Quinones has failed to carry his burden of showing the trial court

---

[9] Additionally, we cannot say that the fleeting reference to Aguayo-Quinones's post-arrest invocation of his right to silence affected his credibility in light of the above evidence, along with other properly admitted evidence undermining his credibility, including the fact that notwithstanding his poor eyesight, he was able to flee to a local chicken restaurant and identify the person therein, and he was further able to generally describe Tarr as well as the Victim. ***See*** N.T., 5/8-10/23, at 303-04.

abused its discretion in denying his motion for a mistrial. ***See Commonwealth v. Moury***, 992 A.2d 162, 178 (Pa. Super. 2010) (holding that "the properly admitted evidence of Appellant's guilt was so overwhelming that the single reference to his post-arrest silence constituted harmless error. . .. Consequently, we conclude a mistrial was unnecessary in this case").

Judgment of sentence affirmed.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 05/07/2025